(No. 36886.—)
AMERICAN BRAKE SHOE COMPANY, Appellee, *vs.* THE DEPARTMENT OF REVENUE, Appellant.

*Opinion filed September 28, 1962.*

WILLIAM G. CLARK, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, A. ZOLA GROVES, and AUBREY KAPLAN, Assistant Attorneys General, of counsel,) for appellant.

SIDLEY, AUSTIN, BURGESS & SMITH, of Chicago, (WILLIAM H. AVERY, EMERSON T. CHANDLER, and BEN B. BOYNTON, of counsel,) for appellee.

Mr. JUSTICE DAILY delivered the opinion of the court:

The question presented here is whether the plaintiff is engaged in a service occupation so as not to be subject to the Illinois retailers' occupation tax, or whether it is engaged primarily in the sale at retail of railroad forks, switch points, switches, guardrails, crossings, samson rails and similar items installed in railroad trackage so as to be liable for the retailers' occupation tax.

The Department of Revenue imposed a deficiency assessment of $79,982.41 against plaintiff, American Brake Shoe Company, for Illinois retailers' occupation tax. American Brake Shoe Company brought an action under the Administrative Review Act in the circuit court of Sangamon County to review the assessment by the Department. The circuit court reversed and cancelled the assessment. The Department appeals directly to this court, the case involving the public revenue.

Three groups of transactions by plaintiff originally were in issue. However, the first group was removed on stipulation of an agreed deficiency; the second group the Department stipulated was not taxable as of the date of the transaction; and the third group is that remaining in issue, being referred to as "special order" sales. Plaintiff designs, engineers and constructs items of railroad trackwork, about 90 per cent being for railroads and 10 per cent for industrial customers. The transactions here were in July, 1950 and October, 1953. They involve trackwork products representing, of the gross receipts contended to be taxable, the following percentages: railbound manganese frogs, 13 per cent; rigid frogs, 11 per cent; spring frogs, 5½ per cent; solid frogs, 13½ per cent; switch points, 15 per cent; switches, 26 per cent; guardrails, 4½ per cent; crossings, 11 per cent; and samson rails, ½ per cent. Detailed and representative examples of each of these items were introduced. Plaintiff's manager of trackwork products, J. P. Kleinkort, with 34 years of experience in the field, and Albert E. Huber, formerly chief engineer for plaintiff company, and others testified. The testimony included explanation of the nature and function of these products and the course of the transactions. Defendant Department offered no evidence contradicting that of plaintiff.

Illustrative of the various items involved was the testimony as to the frogs. It appeared from the testimony that a frog provides a bearing for the railroad wheel tread and a flangeway for the wheel flange. It is located at the intersection of two rails and its purpose is to move the wheels of rolling stock across the intersecting rail. Four different types of frogs are engineered and constructed. Within each of these categories designs are infinitely varied, due to differences in the angles of intersecting rails, in rail section, rail lengths, alignment and curvature of track, density of traffic, and weight of wheel load expected at the location. Angles have infinite variations and there are

more than 73 types of rail sections in use by Class I railroads. Thus, too, the other items involved vary in design and construction with many factors, including location at which the same are to be used.

The evidence showed that plaintiff does not stock any of these items of trackwork in advance because it cannot set up standard specifications or patterns for a particular frog or other such item in advance of the railroad's order. The needs, alignment, angles and other features of the location at which the item is to be installed or used are variable and different. Upon order being placed with plaintiff for one of the items here involved, plaintiff's engineers had to make an actual survey drawing of the location where the trackwork was to be installed or else the railroad would have to furnish basic information, such as track angle, rail section, curvature of rail, heel and toe lengths and other information. In some cases the customer furnished drawings but in no case were these so drawn that they could be used to construct the item. On the basis of this information, plaintiff's engineers prepared layout blueprints and drawings, pattern drawings, machining detail plans and shop plans. After processing of the order in the engineering department, orders go to the shop for actual construction where the work is done in piece work shop operations. A slight variation of an article from the plan design is sufficient to cause refusal by the customer, which means the item must be scrapped.

It was testified that each of the specific items of trackwork was designed and constructed for a specific purpose and place, could not be stocked in advance of the order, could not be produced on an assembly-line basis, was not suitable for another customer or at any other location. Total engineering time expended on the trackwork items exceeded for the most part actual man hours of labor in construction by 50 per cent. The items, if refused by the ordering customer, had only salvage of scrap value and

could not be used by anyone else, the scrap value being less than an average of 7½ per cent of the invoice price of the item.

The evidence clearly showed that the trackwork items here involved are specially ordered by the customer for specific use at specific locations; that the items were unique, constructed through a large amount of engineering and technical skill; that once constructed these items had commercial value only to the ordering customer; and that to anyone other than the ordering customer for specific use at a specific location, the items had only scrap value.

As we have many times said, the tax here is on the occupation and not on the sale, though sales are utilized as a measure of the tax to be assessed. Thus, the act does not demand a tax where sales involved, though at retail and for use or consumption and not for resale, are a mere incident to the practice of a profession, (*Babcock* v. *Nudelman,* 367 Il. 626) or to the performance of personal services requiring skill or artistic ability, (*Burgess Co.* v. *Ames,* 359 Ill. 427; *Adair Printing Co.* v. *Ames,* 364 Ill. 342; *A.B.C. Electrotype Co.* v. *Ames,* 364 Ill. 360) or isolated sales by one not engaged in the retail sales business. *Continental Can Co.* v. *Nudelman,* 367 Ill. 446.

The question to be determined is whether the occupation to be taxed is selling personal property at retail, in which service is incidental, or is primarily selling services in which supplying materials or making retail sales is but incidental. That question cannot be determined solely by the ratio which the retail sales bear to the service rendered, or the quantity of personal property sold. *Franklin County Coal Co.* v. *Ames,* 359 Ill. 178; *Mahon* v. *Nudelman,* 377 Ill. 331.

The occupation of plaintiff here was similar to that in *Ingersoll Milling Machine Co.* v. *Department of Revenue,* 405 Ill. 367, where Ingersoll designed and constructed for Caterpillar Tractor a machine built to mill the inside surface

of the faces of main bearing supports in the engine blocks of two types of engines Caterpillar planned to manufacture. At the time of that decision, there was no rule of the Department specifically exempting the occupation of the plaintiff, and the Department there argued that only the so-called service occupations then covered by its rules were exempt, such as blueprinting, photostating, commercial photography, printing, electrotype manufacturing, construction contracting, tailoring, and public utilities. This court disagreed. It held that the design and construction of this machine was like custom tailoring, special tool and die making, pattern making and construction contracting. The court said (p. 373) : "It is not the sale of a machine, but it is the manufacture of a particular machine for a special purpose, and a sale is not taxable where it is merely incidental to a special service rendered the purchaser."

The facts of the instant case are unlike those of *Sterling Steel Castings Co.* v. *Department of Revenue,* 7 Ill.2d 244 upon which the Department relies. The *Sterling* case involved the production and delivery of items on a mass production factory basis according to patterns furnished it by its customers. In the *Sterling* case, the customer ordered from the plaintiff, on the basis of quotations previously submitted, a certain quantity of a designated article, the detailed specifications of which were determined and furnished by the customer. Nor is the instant case like *Kellogg Switchboard and Supply Corp.* v. *Department of Revenue,* 14 Ill.2d 434, relied on by defendant. There the record showed that the switchboards were not "special order." All of the component parts of the switchboard were standardized units assembled by Kellogg. Upon refusal of an order by a customer, the board could have its components disassembled and used in a switchboard for someone else. These cases are not analogous to the facts of the occupation in the instant case.

Further, the very rules of the Department themselves

acknowledge the exclusion of like occupations and lay down similar tests to those this court has applied in the foregoing cases. Department Rule 3, paragraph (2) provides:

"*When Not Liable For Tax.* In a case in which the purchaser employs the seller primarily for his engineering or other scientific skill to design, develop, construct and produce a special machine, tool, die, jig, pattern, gauge or other similar item on special order for and to meet the particular needs of the purchaser, and in such a way that the item, when so produced, has use or value (other than salvage value) only to the purchaser and has use or value only for the specific purpose for which such item is produced by the seller for the purchaser, the seller is engaged primarily in a service occupation rather than in the business of selling tangible personal property and does not incur retailers' occupation tax liability."

As we said in *Oscar L. Paris Co.* v. *Lyons,* 8 Ill.2d 590, "It is appropriate for this court to give consideration to the foregoing regulations," and cited *Skidmore* v. *Swift & Co.* 323 U.S. 134, 89 L. ed. 124, that "We consider that the rulings, interpretations and opinions * * * while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Rule 3(2) follows the tests of the *Ingersoll* opinion. These tests still are the guiding principles of this court as well as of the rule promulgated by the Department. We hold the occupation in the instant case under the rules of the Department as well as under the rules of our decisions is exempt as it meets each of these tests.

Plaintiff was employed by its customers primarily for its engineering skill to design, develop, construct and produce special trackwork on special order to meet the particular needs of its customers, and such trackwork has use or value (other than salvage value) only to the particular

customer and only for the specific purpose and location for which it was produced by plaintiff for the customer.

We are fully cognizant of defendant's argument that the determination of the Department should be sustained even though the court, acting independently, might have reached a different conclusion. This, however, does not prevent a court from reversing the decision of an administrative agency on questions of fact where the finding of the agency is against the manifest weight of the evidence. (*Brown Shoe Co.* v. *Gordon,* 405 Il. 384.) And, in any event, the judicial deference that is rightly given to administrative agencies on questions of fact and on matters of policy within their province does not relieve this court of its ultimate responsibility of determining whether or not, as a matter of law, the occupation of plaintiff is within the purview of the taxing statute.

The determination of the Department in the instant case was contrary to the manifest weight of the evidence and to applicable law laid down by this court. The trial court was correct in cancelling the assessment, and its decree is affirmed.

*Decree affirmed.*