(Nos. 37115, 37116 Cons.—

BUCYRUS-ERIE COMPANY, Appellee, *vs.* FRANCIS S. LORENZ, State Treasurer, *et al.,* Appellants.

*Opinion filed November 30, 1962.*

WILLIAM G. CLARK, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and A. ZOLA GROVES, Assistant Attorneys General, of counsel,) for appellants.

JAMES C. CRAVEN, of Springfield, and SCOTT & SEBO, of Canton, for appellee.

Mr. JUSTICE DAILY delivered the opinion of the court:

These two appeals, involving the same parties and identical issues relating to the revenue, have been consolidated for the purpose of opinion and pose the question of the incidence of use tax upon a machine built to special order.

Plaintiff, Bucyrus-Erie Company, entered into a contract with the Peabody Coal Company, whereby plaintiff sold to Peabody, for the sum of $2,432,000, a wheel excavator for use at the latter's River King strip mine in St. Clair County, Illinois. The contract was, by its terms, governed by the laws of Wisconsin and at its fulfillment the Illinois Department of Revenue, treating the transaction as a sale of tangible personal property at retail, assessed a use tax in the amount of $73,310.55 upon the privilege of using such property in this State. (See: Ill. Rev. Stat. 1959, chap. 120, pars. 439.2, 439.3.) Plaintiff, which collected the tax from Peabody and will refund it if this suit is successful, paid the amount assessed under protest, then filed a complaint in the circuit court of Sangamon County praying for its return and for a temporary injunction, (which was granted,) restraining defendants, the State Treasurer and Director of the Department of Revenue, from transferring the protested payment into the general revenue fund.

Thereafter, although the exact sequence of events is not clear, the Department issued a corrected assessment which, in addition to a tax of $73,310.55, imposed upon plaintiff a penalty of $7,331.06, and the plaintiff requested an ad-

ministrative hearing. Following such a hearing the Department confirmed both the tax and the penalty and issued its final assessment for $81,641.61. However, upon plaintiff's complaint for administrative review, also filed in the circuit court of Sangamon County, the decision of the Department was reversed as being against the manifest weight of the evidence and judgment entered for the plaintiff. On the same day the circuit court also rendered a decree in the prior suit ordering defendants to return to plaintiff the $73,310.55 paid under protest. These appeals by defendants have followed and present the question of whether the transaction between plaintiff and Peabody was a sale of tangible personal property at retail, or one in which the sale was merely incidental to engineering services rendered by the plaintiff.

Undisputed factual background shows that the River King mine, owned and operated by Peabody, is a strip mine operation and that from extensive drilling operations by Peabody engineers it was determined that the seam of coal sought to be mined was covered with a deep over-burden of 75 to 100 feet. The top 35 to 40 feet of such overburden, described as soft material, was comprised of layers of loam, sand and gravel and, insofar as this record shows, the extent of such soft overburden was unique and peculiar to this particular strip mine. The remainder of the overburden, immediately above the seam of coal, was composed of shale and rock. Due to the extent of the soft over-burden and the hazard of slides it created, it was not possible to mine the coal with the stripping shovel normally used and Peabody was interested in an economical way to remove such over-burden.

The plaintiff, Bucyrus-Erie Company, was one of the two companies which design and manufacture strip mining equipment.

To overcome the *prima facie* case of taxability embodied in the Department's corrected return, (see: *Tatz* v. *Dept.*

*of Finance,* 391 Ill. 131, 135; *Anderson* v. *Dept. of Finance,* 370 Ill. 225,) the plaintiff presented the testimony of James P. McDowell, the general superintendent of Peabody. According to McDowell, engineers of both companies sat down together and designed a wheel excavator which would remove the top 30 to 35 feet of the overburden and stack it 420 feet back from the digging point. He could not say how much Peabody engineers had contributed to design, but it was the purport of his entire testimony that Peabody engineers largely submitted the performance and efficiency desired, while plaintiff's engineers supplied the engineering and design necessary to meet Peabody's needs. Wheel excavators, it appears, are not uncommon in the strip mining industry, but from further testimony by McDowell, it was established that this excavator was of special design taking into consideration the unusual amount of soft overburden, the size of the frame required to support the weight of the unusually long stacker, the weight of the material to be removed by conveyor belts, the moisture of the soil, and the surface grades to be encountered in this particular mine. Such an excavator could not remove hard overburden, *i.e.,* shale and rock, nor could it operate in soft overburden that was interspersed with boulders.

The excavator, a gigantic machine, took ten months to construct, the parts being fabricated in plaintiff's Wisconsin plant then transported to the mine by rail where they were assembled by plaintiff's engineers. As was customary in the industry at the time, the parts were welded together instead of riveted.

McDowell, while stating that some of the machine's motors could possibly be used for other purposes, was of the opinion the machine would have only salvage value. In expressing such an opinion, which was uncontradicted, he pointed out that, due to its size, there was no known way of moving the excavator to another mine, and that to dis-

assemble it would necessitate cutting around the welds into the material.

The Department insists that the transaction here was a sale of tangible personal property at retail as defined in section 2 of the Use Tax Act, (Ill. Rev. Stat. 1959, chap. 120, par. 439.2,) and that it therefore measures the use tax imposed by section 3 "upon the privilege of using in this State tangible personal property purchased at retail." (Ill. Rev. Stat. 1959, chap. 120, par. 439.3.) In so contending, the Department places its reliance upon our decisions in *Kellogg Switchboard and Supply Corp.* v. *Dept. of Revenue,* 14 Ill.2d 434, and *Sterling Steel Casting Co.* v. *Dept. of Revenue,* 7 Ill.2d 244, and upon that portion of paragraph 1, Rule 3 of the departmental Rules and Regulations applicable to both retailers' occupation and use taxes which states: "The seller is not exempt under paragraph 2 of this rule merely because he produces the tangible personal property, nor because he does not carry it in stock and so produces it only upon receipt or order therefor, nor because he alters a more or less standard type of tangible personal property to meet the particular needs of the purchaser."

Plaintiff asserts, however, that the transaction was not such a sale at retail as would measure the tax, relying principally upon *Ingersoll Milling Machine Co.* v. *Dept. of Revenue,* 405 Ill. 367, and paragraph 2 of Rule 3 which says: "WHEN NOT LIABLE FOR TAX. In a case in which the purchaser employs the seller primarily for his engineering or other scientific skill to design, develop, construct and produce a special machine, tool, die, jig, pattern, gauge or other similar item on special order for and to meet the particular needs of the purchaser, and in such a way that the item, when so produced, has use or value (other than salvage value) only to the purchaser and has use or value only for the specific purposes for which such item is produced by the seller for the purchaser, the seller is engaged primarily in a

service occupation rather than in the business of selling tangible personal property and does not incur retailers' occupation tax liability."

Stated otherwise, and as applied to the proof in the record, it is the Department's contention that the plaintiff did no more than to adapt an excavator of standard design to the needs of Peabody, and that the article sold, rather than plaintiff's engineering services and skill, was the primary substance of the transaction. As opposed to this, it is plaintiff's position that it was employed by Peabody primarily for its skill in engineering and design to construct a special machine for a special purpose, and that the transaction was, in the ultimate, the sale of a special order machine built for a special purpose, having no value or utility, except as salvage, other than for the special purpose for which it was produced.

While we are cognizant that there are no two cases with precisely the same facts, it is our opinion that the transaction in *Ingersoll Milling Machine Co.* v. *Dept. of Revenue*, 405 Ill. 367, which was held not to measure the retailers' occupation tax, has compelling and controlling similarity here. In that case, at the request of the Caterpillar Tractor Company, Ingersoll engineered and manufactured a special milling machine for use by Caterpillar in the production of a new type industrial engine. The machine, costing around $29,000 was required to have special and complicated features, and was a single purpose, specially engineered product likely to be the only one of its kind ever built. And once its special use and purpose was accomplished, the milling machine had no commercial value except as salvage. Under such facts, this court held that the transaction was not a sale of a machine at retail, but the manufacture of a machine for a special purpose in which the sale was merely incidental to the engineering services rendered the purchaser.

The proof in the instant case reveals a parallel for each

of the factual facets which were in the *Ingersoll* case, and here we have the added extreme of a machine taking ten months to construct on the property of the purchaser, the only place it could be put together and at the same time be utilized for the special purpose desired. Moreover, the proof brings the transaction here within the exemption of paragraph 2 of Rule 3, rather than the language of paragraph 1 relating to the "alteration" of a "standard" product. While we do not doubt that plaintiff does, and has in the past, engineered and constructed other wheel excavators, it was also apparent in the *Ingersoll* case that the seller had manufactured and designed other milling machines. But in each case the purchaser was confronted with technical problems that could not be met with standard machines; in each case the purchaser turned to the seller to design and engineer a special machine to fill the special need; in each case the machine had immediate value and use only for the particular purpose at a particular location (cf. *American Brake Shoe Co.* v. *Dept. of Revenue,* 25 Ill.2d 354) ; and in each case the seller designed and engineered a special machine which, except for salvage, had no commercial value once it had served its purpose. In short, there was in each case more than the alteration of "a more or less standard type of tangible personal property," to which paragraph 1 of Rule 3 applies the tax.

Nor, when their facts are stated, is the Department aided by *Kellogg Switchboard and Supply Corp.* v. *Dept. of Revenue,* 14 Ill.2d 434, or *Sterling Steel Casting Co.* v. *Dept. of Revenue,* 7 Ill.2d 244. An analysis of the *Kellogg* case shows that the transaction involved the sale of telephone switchboards which were not special order, which were comprised of standard parts assembled by Kellogg, and which, if refused by the customer, could have been disassembled and their components used in other switchboards. The *Sterling* case is even farther removed on its facts. There, where the mass production and delivery of steel castings was

involved, Sterling manufactured the castings from patterns furnished by its customers and it was our holding that Sterling was not primarily engaged in furnishing technical engineering service.

Upon a close analysis of the present record we are convinced that the transaction here was primarily the utilization of plaintiff's technical skills to design and engineer a special machine for a special purpose, rather than a mere sale at retail of tangible personal property. We therefore conclude that the administrative decision of the Department was against the manifest weight of the evidence and, accordingly, affirm the decree and judgment of the circuit court of Sangamon County.

*Decree and judgment affirmed.*