CARL W. DAWDY *et al.*, Plaintiffs and Counterdefendants and Appellants–Cross-Appellees, v. LESTER SAMPLE *et al.*, Defendants and Counterplaintiffs and Appellees–Cross-Appellants.

Fourth District   No. 4—88—0214

Opinion filed January 9, 1989.

Gustine & Theivagt, Ltd., of Carrollton (Charles E. Theivagt, of counsel), for appellants.

Moore & Goetten, of Jerseyville (Norbert J. Goetten, of counsel), for appellees.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiffs appeal a trial court order which found a mutual breach of contract, dissolved a joint venture, split assets of the venture, rendered an accounting, and resolved damages issues. Plaintiffs contend the trial court's determination that a mutual breach occurred is contrary to the manifest weight of the evidence, that the trial court erred in dividing the property and ordering incidental relief, that they were entitled to specific performance of their agreement with defendants, that the trial court's award of damages on one sale was erroneous, and the trial court's determination that no breach of contract had occurred in connection with the sale of lot 19 was contrary to the manifest weight of the evidence.

Defendants cross-appeal. They contend plaintiffs' argument exceeds the scope of their notice of appeal, plaintiffs had a duty to mitigate damages, and the trial court's determination of a mutual breach of the escrow agreement was contrary to the manifest weight of the evidence.

We affirm in part, vacate in part, and remand.

Testimony in the instant case principally came from plaintiff, Carl Dawdy (Dawdy), and defendant, Lester Sample (Sample). Two contracts are disputed. The primary dispute concerns an agreement to convey an undivided one-half interest in a 10-acre parcel of ground (Escrow Agreement). A secondary dispute occurred over the sale of an individual lot within the 10-acre parcel (lot 19).

Carl and Connie Dawdy purchased a 10-acre tract of ground in Greenfield in 1979. They divided the property into 25 lots and planned to develop the property for residential use. The property is called Dawdy's North Addition. Dawdy is a building contractor. He builds three to four homes per year and planned to build the homes on Dawdy's North Addition. After Dawdy had begun initial development of the tract, he sold lot 19 to defendants in 1982. The agreement on this sale states that the Samples, defendants, paid $3,000 down and a balance of $5,460 was due on or before May 1, 1983, if the sewer line, water line, and street were completed. Dawdy testified that he had constructed the utility lines and graded the road. He put oversized

rock on it and then smaller rock. He finished in September of 1983. Dawdy understood that the balance of the payment for the lot was to be in cash and used to help complete the road. However, the Samples never paid him in cash.

Because he was not paid in cash, Dawdy testified he was unable to pay a subcontractor, Western Asphalt Company, who had provided rock. Carrying charges accrued on his account with Western Asphalt Company. In count III of his second-amended complaint, Dawdy requested the difference between the interest charged on the Escrow Agreement and that charged on the account with Western Asphalt ($693.94) as damages. Dawdy admitted that the road was not completely finished until 1984.

Sample stated that he did not know anything about Dawdy's dealings with Western Asphalt Company. In April 1983, Sample asked Dawdy about the utility lines and roads for lot 19 because nothing had been done.

Sample handled the paperwork for the sale of lot 19. When he received the abstract, he believed there would not be any way for Dawdy to convey clear title to lot 19. He discovered the property was mortgaged, had two years delinquent taxes, and several mechanic liens against it. Dawdy admitted that the bank had contacted him about foreclosing on the 10-acre parcel. Sample stated he told Dawdy the only way to clear title to lot 19 was to pay off all of the liens on the 10-acre property. Sample admitted, however, that he did not seek a release from the bank for lot 19.

The parties then entered negotiations which resulted in the Escrow Agreement, executed April 15, 1983. Dawdy testified Sample was to pay off all of the liens in exchange for one-half interest in the 10-acre parcel. Sample testified that he acquired the entire 10-acre plot, less properties previously sold, by paying off all the indebtedness and releasing a lien on Dawdy's parents' lot.

The documents relating to the property show that the Dawdys sold Dawdy's North Addition and a house on Melissa Street to the Samples for $70,829.16, the amount of the liens against the property on April 15, 1983. A warranty deed was filed on that date. In the real estate Escrow Agreement the Samples agreed to sell the Dawdys an undivided one-half interest in Dawdy's North Addition for $35,914.58. Between April 15, 1983, and April 14, 1984, the principal accrued interest at $11\frac{3}{4}\%$. After April 14, 1984, the interest rate was to be changed in line with the rate charged by the Carrollton Bank. The purchase price and any accrued interest were to be paid from the sale of lots to third parties. The Dawdys' one-half of the sales price was to

be credited against the balance owed Sample on the indebtedness. All parties expected to profit from their joint effort to develop the subdivision.

The Escrow Agreement states the real estate taxes and insurance are to be split equally. All maintenance and improvement costs were to be split equally. The lots were sold subject to Dawdy's right to construct homes upon them. The Escrow Agreement further stated that if the Dawdys failed to pay their portion of the tax assessments or insurance, the Samples could make the payment and add that amount plus interest to the principal of the debt. In the event of a default by the Dawdys, the Escrow Agreement stated the Samples could consider the entire balance immediately due, proceed by any appropriate manner to recover the balance, or foreclose the contract as a mortgage.

In December 1983, Dawdy went to Sample's office concerning the lot 19 sale. On December 31, 1983, the balance of the purchase price on lot 19 was credited against the balance due on the Escrow Agreement. Dawdy did not object to the credit. The street was not brought up to city standards until August of 1984.

The first sale under the Escrow Agreement was a house on Melissa Street in Greenfield. This sale occurred in June 1983. Sample negotiated the sale. He stated that he and Dawdy had agreed to accept $20,000 for the Melissa Street property. The owner of the Melissa Street property wanted to trade his house ($40,000 value) for the Melissa Street house ($24,900 value). Sample stated he and Dawdy discussed the proposed trade and the difference due to the purchasers. They agreed to a credit of $11,000 against Dawdy's debt on the Escrow Agreement with Sample taking the risk of resale.

Dawdy stated the conversation never occurred. Sample did not inform him of the trade or of the $24,900 sale price for the Melissa Street property. He only learned of the discrepancy after suit had been instituted.

The Melissa Street home was sold for $24,900. Dawdy's account on the Escrow Agreement was credited with $11,000 for the sale of the home. Under the terms of the Escrow Agreement, he should have been credited for half of the sales price. All of the 1982 real estate taxes were charged to Dawdy. Under the terms of the Escrow Agreement, only one-half of the taxes should have been charged to him. Sample admitted that the taxes were not correctly apportioned. However, he asserted the oral agreement changed the terms of the Escrow Agreement. The trial court found for plaintiff on this dispute, which is not an issue on appeal.

Sample provided an end-of-the-year accounting to Dawdy's bookkeeper in 1983 and 1984. The accountings listed taxes, insurance, and maintenance expenses. They showed credits for sales. Dawdy stated he did not know whether Sample sent the accounting directly to him or to his bookkeeper. He did, however, use them for tax purposes. Dawdy testified Sample did not directly send him any bills, nor did he discuss the accountings.

In May 1985, Sample went to Dawdy to discuss finances. Both parties agree Sample told Dawdy he needed some monetary contribution of expenses for the subdivision. Dawdy stated he agreed to contribute if money became available to him, but no money became available. Dawdy testified no specific bills or amounts were discussed during the May meeting. Dawdy never asked how much money he owed and did not ask for the actual bills. Dawdy stated he understood all expenses were to be financed by Sample and his portion paid through the sale of the lots. Dawdy stipulated at trial that the language of the Escrow Agreement was contrary to his understanding of the method of payment.

On September 24, 1985, Dawdy received a letter from Sample. The letter states the 1983 and 1984 expenses were in default. It suggested Dawdy returned the Escrow Agreement marked "null and void." The letter does not contain an itemized list of the amounts due. Dawdy testified that prior to September 1985, Sample never billed him for taxes, insurance, repairs, or improvements.

The accounting statements sent to the tax preparer were itemized and showed that Dawdy's one-half of the expenses for 1983 and 1984 were added to the principal amount due under the Escrow Agreement. Dawdy admitted that he never asked Sample how much he owed or offered to pay specific bills.

Sample testified that after Dawdy failed to make any payment in response to the May 1985 conversation, he sent the September letter to cancel the Escrow Agreement. On November 13, 1985, he conveyed lot 22 to Thein. The contract in connection with lot 22 did not contain a restriction enabling Dawdy to construct the home on the lot. The Thein transaction involved the trade of Thein's home for a lot and cash. Sample believed Dawdy would forget about the contract, considering it terminated after the September 1985 letter. The deed to lot 22 shows that it was conveyed without the Dawdys' signatures.

Sample stipulated that $5,000 was a "fair and reasonable" profit margin on the Thein home. The Thein home was approximately 1,500 square feet.

Dawdy testified that his construction profits are 10% of the build-

ing contract price. The contract price of homes in Dawdy's North Addition run $40,000 to $60,000. Twenty lots out of the original 25 were unsold at the time of the trial. The lots were roughly equal in value. Dawdy stated that if the court partitioned the property, he wanted $5,000 lost building profits on defendants' lots.

Dale Wooldridge, a real estate broker, testified the unsold lots were worth $8,000 apiece or approximately $152,000. Linda Pohlman, a real estate salesperson, said she thought the unsold lots were worth approximately $7,500 apiece. The larger ones would bring $8,000.

Sample stated that except for the Melissa Street transaction, he agreed with Dawdy's determination of the amount due on the Escrow Agreement. Sample stated the agreement between him and Dawdy was stopped dead center, both had interpreted the Escrow Agreement in different ways, and both could have contacted the other to discuss finances. He was willing to sell his half to Dawdy for $30,000. Sample further stated that Dawdy did not charge for his personal services to develop the area and, similarly, Sample did not charge a fee for real estate sales. Both worked to increase the value of the subdivision and expected to profit.

The court then found that both parties had breached the April 15, 1983, Escrow Agreement by failing to communicate with each other. The court noted the communication which occurred was not mutually understood by the parties. The limited and inadequate communication provided the reason both had breached the agreement. The court stated that although Dawdy was obligated to pay one-half of the taxes, insurance, and maintenance, he never asked for an itemized list of expenses. Sample, however, did not directly provide Dawdy with such a list. At the May 1985 meeting, Sample told Dawdy it would help if he would provide some of the funds for their joint venture. Dawdy indicated he would provide some of the funds but did not do so. However, no specific amounts were discussed at this meeting. The court further found that Dawdy breached the agreement by failing to pay his portion of the expenses. Sample then breached the agreement by selling a lot without the restrictive clause.

The court noted that when obligations are not fulfilled, full benefits are not due in equity. It ordered a division of the remaining lots, Dawdy pay Sample $32,223.97 plus interest, and ordered Sample to pay Dawdy $4,600 as lost profits on the Thein sale. The court further stated that Dawdy had no right to build homes on the lots apportioned to Sample.

The trial judge found the balance of the purchase price for lot 19 had been credited to Dawdy's account prior to the time the improve-

ments were completed.

Initially, the Dawdys, plaintiffs, argue the Samples, defendants, were not entitled to payment of $32,223.97 plus interest because the court found the defendants had breached the agreement, the court erred in finding the plaintiffs had breached the agreement, and if the plaintiffs did breach the agreement, their failure to pay their share of expenses was caused by the defendants' conduct in adding expenses in the past to the principal amount of the loan. Plaintiffs also argue defendants' demand for payment was not sufficient in form or specific enough to require plaintiffs to respond. Plaintiffs contend the trial court erred in finding a duty to communicate concerning expenses. Plaintiffs further assert the record contains no evidence of their breaching the Escrow Agreement.

Defendants argue the trial court correctly found plaintiffs breached the agreement but contend the determination that they violated the agreement is contrary to the manifest weight of the evidence. Defendants further contend they only sold the property to Thein without the restricting clause after plaintiffs had unilaterally breached the agreement and the contract had been rescinded. Therefore, they argue the court correctly awarded them damages on the contract because of plaintiffs' unilateral breach. However, the court erred in finding any breach on their part.

■ The Escrow Agreement's language does not mention communication between the parties or set forth expressly how plaintiffs are to be notified of and billed for their portion of the expenses. However, every contract contains an implied promise of good faith and fair dealing between the parties to the contract. (*Honkomp v. Dixon* (1981), 97 Ill. App. 3d 476, 422 N.E.2d 949.) Generally, whether a person has acted in good faith and so complied with the conditions is a question of fact. (*Honkomp*, 97 Ill. App. 3d 476, 422 N.E.2d 949.) The trial court's determination of factual matters will only be reversed when it is contrary to the manifest weight of the evidence. *Chicago Investment Corp. v. Dolins* (1985), 107 Ill. 2d 120, 481 N.E.2d 712.

■ In the instant case, Dawdy conceded at trial that his understanding of the contract regarding payment for expenses was erroneous. The actual language of the Escrow Agreement is not in dispute. Both parties, in essence, argue the court erred in implying a mutual duty to communicate concerning their venture and a mutual breach of that duty. The duty to communicate is a part of the implied promise to act in good faith and to deal fairly with each other. Since both parties admitted that they did not directly communicate concerning expenses until the May 1985 conversation, this duty was breached.

Defendants did send an itemized list to plaintiffs' accountant in 1983 and 1984. However, they did not send plaintiffs any statements or discuss the expenses with plaintiffs prior to 1985. Plaintiffs never requested any billings or inquired about amounts due until 1985. The trial court's determination of a mutual breach of an implied promise to communicate is supported by the evidence. *Chicago Investment*, 107 Ill. 2d 120, 481 N.E.2d 712.

Since neither party was in full compliance with the terms of the Escrow Agreement, neither was entitled to full damages for the other's breach. In order for a party to recover on a contract, he must have performed his part of it. (*Goldstein v. Lustig* (1987), 154 Ill. App. 3d 595, 507 N.E.2d 164; *George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.* (1975), 32 Ill. App. 3d 249, 336 N.E.2d 185; *South Beloit Electric Co. v. Lar Gar Enterprises, Inc.* (1967), 80 Ill. App. 2d 367, 224 N.E.2d 306.) The trial court correctly found plaintiffs were not entitled to lost future profits on the lots apportioned to defendants. Similarly, defendants were not entitled to foreclosure of the contract or forfeiture of plaintiffs' interests. *Ross v. Danter Associates, Inc.* (1968), 102 Ill. App. 2d 354, 242 N.E.2d 330.

■ Plaintiffs argue the trial court erroneously partitioned the property and erroneously ordered them to pay the contract price to defendants as damages. Plaintiffs characterize the trial court's order as a partition order. It was not. The trial court in its memorandum opinion noted the parties' joint venture concerning the real estate had come to a standstill. A joint venture is an association of two or more persons to carry out a single enterprise for profit. (*O'Connell v. Pharmaco* (1987), 164 Ill. App. 3d 68, 517 N.E.2d 688; *Ruskin v. Rodgers* (1979), 79 Ill. App. 3d 941, 399 N.E.2d 623.) The existence of a joint venture is inferred from the facts and circumstances with the intent of the parties being the most significant element. *O'Connell*, 164 Ill. App. 3d 68, 517 N.E.2d 688.

Generally, the following elements are determinative of such an intent: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill, or knowledge; (4) a degree of joint proprietorship or mutual right to the exercise of control over the enterprise; and (5) provision for joint sharing of profits and losses. (*Ambuul v. Swanson* (1987), 162 Ill. App. 3d 1065, 516 N.E.2d 427.) In the instant case, the facts establish the parties had entered a joint venture to develop and market Dawdy's North Addition. See *Ambuul*, 162 Ill. App. 3d 1065, 516 N.E.2d 427.

■ However, their venture had reached an impasse. Upon dissolution of the joint venture, the trial court properly found plaintiffs should pay defendants for the property in accordance with their original agreement. (See *Epstein v. Yoder* (1979), 72 Ill. App. 3d 966, 391 N.E.2d 432.) The trial court then split the property, which was the sole asset of the joint venture, between the parties. Since the property's value was disputed, this was fair to both parties. Plaintiff's argument as to lost profits on the lots allocated to defendants is equally without merit. No error occurred in this procedure.

Plaintiffs argue the escrow agreement should be specifically enforced by this court. Plaintiffs concede that they were in error in initially failing to pay expenses because they misinterpreted the agreement. However, they argue this misinterpretation was due to defendants' conduct. Further, plaintiffs admit the contract language is clear and state they will comply in the future. Since the terms of the contract are clear, they ask this court not to relieve defendants of the duty to perform it.

■ The determination of whether to grant specific performance lies within the discretion of the trial court. All facts must be considered in making this determination. (*Mid-Town Petroleum, Inc. v. Dine* (1983), 114 Ill. App. 3d 112, 448 N.E.2d 596.) A court may deny specific performance where some element of the cause makes it appear specific performance would be unjust. In the instant case, plaintiffs admitted misinterpreting the contract and failing to pay a ratable portion of the expenses. Enforcing the contract would be unjust under such circumstances.

■ ■ Plaintiffs next argue that in light of the stipulation, the award of lost profits on the Thein home was erroneous. Defendants argue the court could correctly discard the stipulation and was not bound by it. Defendants stipulated that $5,000 was a fair and reasonable profit for the Thein home. A stipulation is an agreement by the parties with regard to an issue before the court. (*American Pharmaseal v. TEC Systems* (1987), 162 Ill. App. 3d 351, 515 N.E.2d 432.) Courts generally favor stipulations which simplify litigation. They generally will enforce them unless the stipulation is unreasonable, the result of fraud, or violative of a public policy. (*In re Marriage of Galen* (1987), 157 Ill. App. 3d 341, 510 N.E.2d 597.) Generally, a party cannot dispute stipulated matters on appeal. The parties, however, cannot bind the court by stipulating to a question of law or the legal effect of facts. (*American Pharmaseal*, 162 Ill. App. 3d 351, 515 N.E.2d 432.) In the instant case, the stipulation was acknowledged by the court at the time defendants made it. We agree the court should

have honored the stipulation which pertained to the amount of lost profits.

■■ Plaintiffs next argue the trial court erred in denying them damages for the failure to pay cash for lot 19. Plaintiffs' argument has little merit. The balance of the purchase price for lot 19 was credited to their account prior to the completion of the road, one of the conditions for payment stated in the purchase agreement. The contract for the sale of lot 19 does not say the balance of the purchase price had to be made in cash. Since defendants paid the purchase price for lot 19, plaintiffs were not entitled to damages, and the trial court's order was supported by the manifest weight of the evidence.

■ Defendants argue plaintiffs' argument concerning partition, specific performance, and lot 19 exceeds the scope of their appeal. Notices of appeal are liberally construed. The notice of appeal informs the prevailing party that the unsuccessful party is seeking review of the judgment. Briefs specify the precise points relied upon for reversal. (*Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 394 N.E.2d 380.) Here, the notice specified plaintiffs were appealing the order dated March 1, 1988, "wherein and whereby Partition was granted the Defendants in the breach of their joint venture contract to Plaintiffs and Plaintiffs were denied equitable damage for lost profits thereon." The language covers the trial court's order and specific performance as an alternative to it. Damages for lot 19 are not mentioned in the notice; however, they were a part of the relief afforded by the court. The notice of appeal was sufficient. *Burtell,* 76 Ill. 2d 427, 394 N.E.2d 380.

■■ Defendants argue plaintiffs had a duty to mitigate damages in connection with the building of the Thein home. Defendants have waived review of this issue. They did not raise the issue below and seek to argue it for the first time on appeal. Issues not raised in the trial court are generally considered waived on appeal. (*Board of Education of Township High School v. Kusper* (1982), 92 Ill. 2d 333, 442 N.E.2d 179.) Additionally, at trial, defendants stipulated to the damages amount.

For the above reasons, we vacate the trial court's order as it applies to lost profits on the Thein home and remand for entry of the stipulated damages amount, and affirm on all other aspects.

Affirmed in part; vacated in part and remanded.

SPITZ and GREEN, JJ., concur.