COMMONWEALTH EDISON COMPANY *et al.*, Plaintiffs-Appellees, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellants.

First District (4th Division)   No. 88—0537

Opinion filed February 16, 1989.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Bret A. Rappaport, George W. Foster, and James D. Newbold, Assistant Attorneys General, of Chicago, of counsel), for appellants.

Winston & Strawn, and Commonwealth Edison Company, both of Chicago (Kimball R. Anderson, Michael J. O'Rourke, Lawrence R. Desideri, and Harlan M. Dellsy, of counsel), for appellees.

JUSTICE LINN delivered the opinion of the court:

The Westinghouse Electric Company contracted with the Commonwealth Edison Company to design, manufacture, and install four turbine-generators for use in two of Commonwealth Edison's nuclear power stations. The Illinois Department of Revenue assessed Commonwealth Edison $4,247,308.25 in use tax and interest on two of the generators. Commonwealth Edison paid the assessment under protest.

Plaintiffs, Commonwealth Edison and Westinghouse, subsequently brought an action in the circuit court of Cook County against defendants, the Department of Revenue, the Director of the Department, and the State treasurer. Plaintiffs claimed that the transaction was not subject to use tax, but rather, service use tax, which Commonwealth Edison paid. Plaintiffs sought, *inter alia,* a refund of the assessed amount. The trial court entered judgment for plaintiffs. Defendants appeal, assigning error to the trial court's findings and judgment.

We affirm the judgment of the trial court.

BACKGROUND

I

██ A brief review of the applicable tax law is necessary to better understand the facts in the case at bar. The Use Tax Act imposes a tax upon the privilege of using in Illinois tangible personal property purchased at retail out of State. (Ill. Rev. Stat. 1983, ch. 120, par. 439.3.) The use tax was designed to supplement the retailers' occupation tax (ROT), which applies to purchases made in the State. The primary purposes of the use tax are to prevent Illinoisans from avoiding the ROT by making out-of-State purchases, and to protect Illinois merchants against such diversion of business to out-of-State retailers. *Klein Town Builders, Inc. v. Department of Revenue* (1966), 36 Ill. 2d 301, 303, 222 N.E.2d 482, 484.

With some exceptions, the use tax is imposed at the same rate as the ROT. (Compare Ill. Rev. Stat. 1983, ch. 120, par. 439.3 with ch. 120, par. 441.) Further, if tangible personal property, bought in Illinois, would not be taxable under the ROT Act (Ill. Rev. Stat. 1983, ch. 120, par. 440 *et seq.*), then the use of that property is not taxable also under the Use Tax Act. Ill. Rev. Stat. 1983, ch. 120, par. 439.3.

██ In contrast to the use tax, the Service Use Tax Act (Ill. Rev. Stat. 1983, ch. 120, par. 439.31 *et seq.*) imposes a tax upon the privilege of using in Illinois real or tangible personal property acquired as an incident to the purchase of a service from a serviceman. At the time this action arose, the service use tax was less than the use tax. Ill. Rev. Stat. 1983, ch. 120, par. 439.33.

II

Commonwealth Edison owns and operates the Byron Nuclear Power Station and the Braidwood Nuclear Power Station. Each station contains two units, and each unit requires a turbine-generator. In June 1972, Westinghouse contracted with Commonwealth Edison to design, manufacture, and install the four generators. They were delivered during 1978 through 1980. Also during this time, Commonwealth Edison paid service use tax on all four generators. Specifically, Commonwealth Edison paid a total of $1,259,291.85 in service use tax on the Byron Unit 2 and the Braidwood Unit 2 generators.

The record shows that defendants accepted the service use tax for the generators in Byron Unit 1 and Braidwood Unit 1. However, defendants concluded that the remaining generators, in Byron Unit 2 and Braidwood Unit 2, constituted a purchase of tangible personal property. Thus, the transaction was subject to use tax. Accordingly,

defendants assessed Commonwealth Edison $2,708,068.97 in use tax and another $1,539,239.28 in interest, totalling $4,247,308.25.

On June 7, 1984, Commonwealth Edison paid the assessment under protest, pursuant to sections 2a and 2a.1 of the State Officers and Employees Money Disposition Act (Ill. Rev. Stat. 1983, ch. 127, pars. 172, 172a). On June 26, also pursuant to the statute, plaintiffs filed a complaint in the trial court against defendants. Plaintiffs sought initially a preliminary injunction restraining defendants from: (1) depositing the money into the State treasury, (2) transferring the money from the protest fund to any other fund, and (3) taking any action against plaintiffs to collect any of the money paid under protest. Reaching the merits, plaintiffs sought a refund of the assessment and an injunction permanently restraining defendants from assessing use tax, interest, or penalties based on the June 1972 transaction. The trial court issued the preliminary injunction.

At trial, Commonwealth Edison claimed that it acquired the generators as an incident to Westinghouse's engineering services. Plaintiffs contended that their transaction was, therefore, subject to service use tax, rather than use tax.

Plaintiffs' evidence is summarized as follows. A turbine-generator consists of several integrated components; for example, a lubricating system, a feedwater heating system, a moisture separation and reheating system, and so on. Following industry practice, Commonwealth Edison hired an architect engineer to prepare functional specifications for all of the equipment at the nuclear power station, including the generators. These specifications set performance parameters for the generators, such as steam inlet conditions, desired kilowatt output, and cooling and feedwater temperatures. The specifications do not provide the necessary design to build the generators. Rather, Westinghouse must design the generators to meet the specified performance parameters.

Westinghouse does not have standard turbine-generator systems, or catalogs of standard designs, ready to sell. Rather, the generator design is "tailor-made," based on the site of the plant and customer specifications. When Westinghouse contracted with Commonwealth Edison in June 1972, no designs existed because Westinghouse prepared them specifically for the Byron and Braidwood stations.

Commonwealth Edison's specifications required completely new electrical, thermal, and mechanical designs. Other components of the generators, although found on all turbine-generators, were modified specifically for the Byron and Braidwood generators and can be used nowhere else.

Even if some of the generators' individual specifications did not require unique designs, the combination of all of the specifications required a unique generator design as a whole. Further, the interaction between the entire turbine-generator system and the remainder of each station is unique.

Additionally, the generators have use or value only to Commonwealth Edison for the purpose for which they were built. They have no resale value because of their uniqueness. No other utility companies would buy them because none could use them. All of this evidence went to plaintiffs' claim that the generators were unique and incidental to Westinghouse's services.

Defendants claimed that the turbine-generators were not mere incidents of the purchase of Westinghouse's services. Rather, the generators themselves were the focus of the transaction. The turbine-generators are composed of standard components, and these components are either standard models or have use or value to other utility companies. Defendants contended that the transaction was, therefore, subject to use tax, rather than service use tax.

Defendants' evidence is summarized as follows. A standard component of a turbine-generator is the high pressure turbine. In the Byron and Braidwood turbine-generators, the high pressure turbines are predesigned, with standard dimensions. Westinghouse does not alter the shape of the component to fit the customer's foundation; rather, the customer must design the foundation to fit the predetermined size of the component.

The low pressure turbine is another standard component in a turbine-generator; again, Westinghouse uses a standard model. Westinghouse expressly designed it with interchangeable rotors. As further proof of the low pressure turbine's generic quality, the Public Service Company of Indiana hired Westinghouse to design the Marble Hill Nuclear Power Station, an exact duplicate of the Byron and Braidwood stations. Marble Hill was never completed, due to financial reasons. When construction ended in 1984, Commonwealth Edison bought three low pressure turbine rotors designed and built for Marble Hill for use in the Byron and Braidwood low pressure turbines.

Defendants conceded that the generator component of the turbine-generator was unique. However, it had use or value to other utility companies.

The trial adduced evidence rebutting defendants' evidence. Although the high pressure turbines have standard dimensions, the path of their internal blades actually determines their uniqueness. Westinghouse designed the high pressure turbines with a unique

blade path, based on Commonwealth Edison's specifications. Additionally, although Public Service Company wanted an exact duplicate of the Byron and Braidwood stations, Westinghouse could not design such a duplicate due to different specifications and site conditions. Marble Hill differed from the Byron and Braidwood stations in many respects.

At the close of the evidence, the trial court entered judgment for plaintiffs. The court found that Westinghouse was engaged in a service-type business. Further, the court found that Commonwealth Edison hired Westinghouse primarily for its engineering and other scientific skills, to design and produce special machines to meet Commonwealth Edison's particular needs. The court additionally found that the turbine-generators have use or value only for the specific purpose for which Westinghouse produced them and that they have no use or value to anyone other than Commonwealth Edison. The court awarded plaintiffs the assessment of $4,247,308.25 plus interest, totalling $5,168,966.23, in addition to costs. Defendants appeal.

OPINION

■■ Where a seller renders a service or skill in manufacturing a special machine for the particular and exclusive use of a buyer, and where the machine was merely incidental to the service or skill, the transaction is not taxable under the ROT Act or the Use Tax Act. (*Velten & Pulver, Inc. v. Department of Revenue* (1963), 29 Ill. 2d 524, 529, 194 N.E.2d 253, 256.) Our courts reason that in such a case, "the primary occupation of [the seller] is that of furnishing a specially constructed machine on order produced through the technical engineering skill of the [seller] for the purpose of doing a special job, and not merely a sale at retail of tangible personal property." *Ingersoll Milling Machine Co. v. Department of Revenue* (1950), 405 Ill. 367, 373, 90 N.E.2d 747, 750-51.

■ Conversely, where the article sold is the substance of the transaction and the service or skill rendered is incidental to the product, then the transaction was one for tangible personal property. Therefore, the transaction is taxable under the ROT Act or the Use Tax Act. *Velten,* 29 Ill. 2d at 529-30, 194 N.E.2d at 256.

Based on these principles, the Department of Revenue promulgated its Rule 3, which provides in pertinent part:

"a) When Liable For Retailers' Occupation Tax

1) Sellers of machinery *** to users or consumers incur [ROT] liability except as specified in paragraph (b) hereof. This

is true whether the seller installs such tangible personal property for the purchaser or not. \*\*\*

2) The fact that it is not a stock item and is only produced after an order is received, or is an alteration of a standard item, is not sufficient to exempt it from [ROT] unless it meets all the exemption tests of paragraph (b) below.

3) Even if the sale would otherwise qualify for exemption under paragraph (b) of this Section, the sale is taxable if the designing of the property that is to be sold is done by the purchaser, or by someone other than the seller hired by the purchaser, but the sale is not taxable if the seller is responsible for furnishing the service of designing such property or for contributing substantially to the designing of such property.

\* \* \*

b) When Not Liable For Retailers' Occupation Tax

1) The seller of a special machine \*\*\* or other similar item is engaged primarily in a service occupation, rather than in the business of selling tangible personal property, and so does not incur [ROT] liability with respect to the sale, if the following tests for exemption are all met in the transaction:

A) The purchaser employs the seller primarily for his engineering or other scientific skill to design and produce the property on special order for the purchaser and to meet the particular needs of the purchaser;

B) the property has use or value only for the specific purpose for which it is produced, and

C) the property has use or value only to the purchaser.

2) On the requirement of design by the seller, it is sufficient if the seller is responsible for making a substantial contribution to the designing of the property that is to be produced on special order and sold.

\*\*\*

4) On the question of 'use or value only to the purchaser,' this test for exemption is met if the property is not standard enough to be stocked or to be ordered from a catalog or other type of sales literature, but has to be produced in accordance with special requirements which are peculiar to the purchaser and not common to someone else whose conditions for possible use of the property can be shown by the Department to be reasonably comparable to those of the purchaser." (86 Ill. Admin. Code 130.2115 (1985).)

Although courts consider Rule 3 in applying the principles developed

in *Ingersoll* and its progeny, it is the principles that control and not the regulation. *American Brake Shoe Co. v. Department of Revenue* (1962), 25 Ill. 2d 354, 360, 185 N.E.2d 192, 195.

Defendants claim that the trial court erred in ruling that plaintiffs' transaction was not taxable under the Use Tax Act. Defendants contend that this court may exercise *de novo* review of the trial court's findings and judgment. They argue that the essential facts contained in the record are undisputed, making the issue of whether the property is subject to use tax a question of law. See *Evangelical Alliance Mission v. Department of Revenue* (1987), 164 Ill. App. 3d 431, 439, 517 N.E.2d 1178, 1183.

We reject defendants' contention. True, the record contains some undisputed evidence. However, the record also contains much evidence which the parties contested. Our recitation of the evidence adduced at trial reveals its contradictory nature. For each of the factors in Rule 3, each side presented evidence in support of its position; each side attempted to rebut the evidence of the opponent.

■ Especially in cases involving contradictory evidence, the trial judge, sitting as the trier of fact, is in a position superior to a reviewing court to observe the conduct of the witnesses while testifying and to determine their credibility, and to weigh the evidence and determine the preponderance thereof. A reviewing court will not set aside these determinations because the trial court believed or credited one group of witnesses and did not credit the other group. We may not overturn a judgment merely because we might disagree with it or might, had we been the fact finder, have come to a different conclusion. *Schulenberg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624, 626; *Terminal-Hudson of Illinois, Inc. v. Goldblatt Brothers, Inc.* (1977), 51 Ill. App. 3d 199, 205, 366 N.E.2d 486, 491.

■ As a result of these principles, a reviewing court will not disturb a trial court's findings unless they are against the manifest weight of the evidence. A finding is against the manifest weight of the evidence when an opposite conclusion is clearly apparent. *Terminal-Hudson,* 51 Ill. App. 3d at 206, 366 N.E.2d at 491.

■ In the case at bar, both sides presented evidence on each of the factors in part (b) of the Department's Rule 3. After weighing this evidence, the trial court found that Westinghouse rendered a skill in designing the Byron and Braidwood turbine-generators for the particular and exclusive use of Commonwealth Edison and that the generators were merely incidental to Westinghouse's skill. Based on the record before us, we cannot say that an opposite conclusion is clearly apparent. We hold that the findings and judgment of the trial

court were not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and JOHNSON, J., concur.