JUDY FITCHIE *et al.*, Plaintiffs-Appellees, v. RICHARD YURKO, Defendant-Appellant (Illinois Lottery Commission, Defendant).

Second District No. 2—90—0813

Opinion filed April 12, 1991.

REINHARD, P.J., dissenting.

Mary E. Haglund, of Kovitz, Shifrin & Waitzman, of Arlington Heights (Vincent A. Lavieri, of counsel), for appellant.

Edward F. Diedrich, of Law Offices of Edward F. Diedrich, of De Kalb, and Robert A. Chapski, of Law Office of Robert A. Chapski, Ltd., of Elgin (Michael C. Doyne, of counsel), for appellees.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiffs, Judy Fitchie, Phyllis Huisel, and Frances Vincent, brought this action seeking a declaration of their rights to a $100,000 prize claimed by defendant, Richard Yurko, from the Illinois Department of the Lottery (Lottery). The trial court held that plaintiffs and defendant were entitled to equal shares of the prize money. Defendant contends on appeal that the court erred in that (1) the court lacked jurisdiction to hear the claim since plaintiffs failed to exhaust their administrative remedies, (2) plaintiffs were improperly allowed to amend their pleadings, (3) the court's findings were inconsistent, and (4) the court's decision was not supported by the evidence. We affirm.

The trial testimony revealed the following sequence of events. Plaintiff Phyllis Huisel and her husband, Robert, owned a combination service station and coffee shop, which they called Hitching-A-Ride, in Burlington. Phyllis operated the coffee shop, and, as a part of the coffee shop business, she sold lottery tickets. Defendant Yurko started

coming into the coffee shop in November 1989 to have a cup of coffee or pancakes and to socialize. Sometimes Phyllis would play the lottery with Yurko. Phyllis indicated, but Yurko disputed, that they would share equally in any winnings even when only one of them supplied the money to buy lottery tickets. Plaintiff Judy Fitchie had known Phyllis for a number of years and sometimes helped her in the coffee shop. Judy was acquainted with Yurko only because she saw him occasionally at Hitching-A-Ride.

During the second or third week of February 1990 Phyllis and Judy were both in the coffee shop when Yurko came in and said he wanted to play the lottery. While there were inconsistencies between plaintiffs' and defendant's testimony, as well as minor differences even in the testimony of the various plaintiffs, it appears clear the following events occurred. Phyllis was behind the counter, waiting on customers. Judy, along with plaintiff Frances Vincent, was sitting at the counter. Yurko purchased lottery tickets which needed to have film scratched off the front of them in order to reveal whether a prize had been won. While Phyllis evidently took the money for the tickets, she allowed Yurko to take the tickets themselves from the box, where they were kept behind the counter. Yurko testified that he initially bought $100 worth of tickets, but all of the plaintiffs indicated that he first purchased only two $1 tickets, which he immediately scratched off. One of the two was a $5 winner, which he redeemed for five more tickets.

At some point Yurko asked Phyllis if she wanted to help him scratch the film off the tickets, but Phyllis suggested that he ask Judy to help because she was the luckier one. Subsequently Yurko placed a number of tickets in front of both Judy and Frances and invited them to help him scratch them off. Yurko had not previously met Frances and was not formally introduced to her on the day in question. While Yurko repeatedly denied it, all three plaintiffs testified that Yurko indicated to them that if they would help him scratch off the lottery tickets they would be his partners and would share in any winnings which resulted from those tickets. After playing for some time, Judy uncovered three television sets and announced that she had a winner. At the time, the parties were playing the Fortune Hunt lottery game, and the ticket scratched by Judy gave the owner a chance to compete for a $100,000 prize.

The back of the Fortune Hunt tickets had a line for the name, address, and phone number of the ticket holder. Completed tickets were to be mailed to the Lottery. On Thursdays, 100 tickets were drawn from all of the winning tickets which had been mailed in. From those 100 tickets, six were drawn on the Lottery television show on Satur-

day, and those six ticket owners would be the contestants on the television show the following week. The grand prize in the Fortune Hunt game was $100,000, but other prizes were also awarded. There is indication in the record that a winning ticket holder would receive at least $1,500 if he appeared on the television show.

All of the plaintiffs gave very similar testimony as to what occurred after the winning ticket was scratched. Judy placed the ticket on the counter near Phyllis. Yurko urged Phyllis to fill it out, but she said she did not want to go on television. Yurko indicated he was willing to be on the television show, and, after some discussion, all the parties agreed that Yurko should be their representative and go on television. Yurko then printed "F.J.P. Rick Yurko," representing the first initial of each plaintiff and his own name, on the line provided on the back of the ticket for the name of the ticket holder. He also gave his address and phone number. According to Phyllis, when Yurko started filling out the ticket he told her he was going to put all of the plaintiffs' initials and his name on the ticket and indicated once again that they would be partners no matter what they might win.

During the time Yurko and the plaintiffs were playing the lottery, Robert Huisel and Thomas Vincent, Frances' husband, were having coffee in a booth in the coffee shop. Both spouses testified that after Judy declared she had a winner they heard Yurko ask the three plaintiffs for their initials. He indicated he wanted to put their initials on the ticket because they were partners. Shortly afterwards, Frances and her husband left Hitching-A-Ride, and, while defendant may have bought more tickets, Phyllis and Judy essentially stopped playing. All of the plaintiffs admitted that they did not pay out of their own pockets for any of the lottery tickets that were purchased that day.

Yurko acknowledged that he placed plaintiffs' initials on the back of the winning ticket. He said he did so because he wanted to remember who helped him scratch the ticket. Then, if he won, he could take them out to dinner or give them something for helping him. He indicated that he had uncovered and sent to the Lottery three similar tickets in the past, and the initials would identify the particular ticket involved here. He could not recall who scratched off the winning ticket, and he did not know why he placed plaintiffs' initials on the same line with his name as opposed to some other part of the ticket.

Yurko subsequently mailed the ticket to the Lottery and it was one of the six tickets drawn on March 10, 1990. On March 11 Yurko stopped at Hitching-A-Ride to see the Huisels. Phyllis' daughter, Sherry Payne, was there at the time. Sherry testified that Yurko gave her a nudge in the arm and said, "We are going to be rich." She knew

he was referring to the lottery because her mother had told her about the winning ticket. Phyllis also testified that she heard Yurko make the comment about all of them getting rich. She also said Yurko remarked that Judy would probably use her share to put a down payment on her house and that he was going to go to Las Vegas with his share. Yurko testified that he consulted an attorney regarding the ownership of the ticket about two days before he went on the television show.

The Lottery show on which Yurko appeared as a contestant was taped on March 16 and aired on the evening of March 17. Yurko won the $100,000 prize and placed only his own name on the claim form for the prize. Over the next several days plaintiffs tried unsuccessfully to reach Yurko. On March 22, 1990, they filed this suit, naming both Yurko and the Lottery as defendants. The complaint prayed for a declaration of rights as to the $100,000 lottery prize and sought damages for conversion of the prize money. Plaintiffs were granted a temporary restraining order to prevent the Lottery and Yurko from paying out or collecting on any claim to the prize. On April 2, pursuant to a court order, the Lottery deposited $77,000 with the clerk of the Kane County circuit court. The amount deposited represents the $100,000 lottery prize, minus applicable Federal and State taxes. The Lottery also interpleaded Yurko's wife, Penny Yurko, who was the plaintiff in a suit in De Kalb County seeking dissolution of her marriage to Richard Yurko. At the conclusion of the trial the court declared that plaintiffs and Richard Yurko were each entitled to an equal share of the lottery prize and denied plaintiffs' prayer for damages for conversion.

In this court Yurko initially raises a challenge to the jurisdiction of the trial court to hear this cause on the ground that plaintiffs failed to exhaust their administrative remedies. He argues that plaintiffs should have presented their claim to the Lottery before seeking the aid of the court. Defendant's position cannot be sustained.

■ First of all, defendant relies on section 7.3 of the Lottery Act (Act) (Ill. Rev. Stat. 1989, ch. 120, par. 1157.3) for the proposition that the Act grants primary jurisdiction over matters relating to the Illinois lottery to the Illinois Department of Revenue and the Lottery Control Board. Section 7.3 provides for hearings upon complaints charging violations of the Act or regulations promulgated under the Act. However, there are no allegations in the instant case that the Act or any relevant regulations have been violated. Thus, section 7.3 is inapplicable.

Defendant next asserts that section 13 of the Act (Ill. Rev. Stat. 1989, ch. 120, par. 1163) provides that no prize awarded to a person shall be assignable. While this may be true, it is a nonissue in this case

since no claim has been made that Yurko assigned any portion of the prize money to plaintiffs.

 Finally, defendant contends that under section 19 of the Act (Ill. Rev. Stat. 1989, ch. 120, par. 1169) all claims for prizes from a lottery game must be made to the Department of the Lottery. While defendant correctly states the content of section 19, it is readily apparent the section is intended only to spell out the procedures to be followed when a lottery game involves the purchase of a physical lottery ticket and the ticket must be presented in order to claim a prize. Section 19 does not address multiple claims to ownership of a winning ticket.

Plaintiffs also respond to defendant's exhaustion of remedies argument by pointing to a notice of adopted rules of the Department of the Lottery (Department), which they attached as an exhibit to their response to Yurko's motion to dismiss for lack of jurisdiction. In the response plaintiffs refer to "the Adopted Rules of the Illinois Lottery, as distributed by counsel appearing on behalf of the Lottery Commission." Defendant nowhere challenges plaintiffs' reliance on appeal on the rules embodied in the exhibit or, for that matter, the authenticity of the exhibit itself. Accordingly, we will consider the notice of adopted rules (Rules) as contained in the trial court record.

 Section 1770.160(d) of the Rules states that, when an otherwise valid ticket is submitted as a claim for payment and, before the claim is paid, the Department is put on notice that "ownership of the ticket is disputed by an adverse claimant alleging fraud, theft, loss, conversion or any other misappropriation of the ticket by the claimant of record," the Department may withhold payment for 10 days. When an adverse claimant initiates a timely civil action in a circuit court, the Department must withhold payment of the prize "until an adjudication of the ownership has been rendered by the court." Section 1770.160(d) further provides that in the event of such litigation the Department may interplead and pay the prize money into court. In our view this Rule, established by the Lottery itself, controls the issue raised by defendant. Nothing in section 1770.160(d) calls for adverse claims to be submitted to an administrative tribunal prior to taking action in court. In fact, the Rule appears to anticipate quick invocation of the aid of the court when it authorizes withholding of payment if a claimant's action is begun "within ten working days from and after the Department has received notice of adverse claim." Defendant's position is not supported by the Lottery Act, and it is undercut by the Lottery Rules. We conclude that no administrative remedies were available to plain-

tiffs and the trial court, therefore, properly exercised jurisdiction over plaintiffs' claim.

Yurko's next contention is that the trial court abused its discretion by allowing plaintiffs, at the close of their case, to amend their complaint in order to conform it to the proofs they had presented. Specifically, defendant asserts that, while plaintiffs' original complaint sought recovery on a conversion theory, the amended complaint sought recovery on a partnership theory. The record of the amendments, which were initially made verbally at the conclusion of plaintiffs' case, does not support defendant's characterization of the complaint as amended.

■■■ The Code of Civil Procedure specifically provides for amendment of pleadings at any time for the purpose of conforming the pleadings to the proofs. (Ill. Rev. Stat. 1989, ch. 110, par. 2—616(c).) It is within the sound discretion of the trial court to decide whether to allow amendments after the evidence has been presented, and the court's decision will not be disturbed absent a clear abuse of discretion. (*Servbest Foods, Inc. v. Emessee Industries, Inc.* (1980), 82 Ill. App. 3d 662, 673; *Lawson v. Hill* (1979), 77 Ill. App. 3d 835, 844-45.) Amendment of pleadings cannot be allowed where the amendment alters the nature of the proof required to defend (*Blazina v. Blazina* (1976), 42 Ill. App. 3d 159, 165) or if the other party would be prejudiced or surprised (*Trident Industrial Products Corp. v. American National Bank & Trust Co.* (1986), 149 Ill. App. 3d 857, 866). Examination of the facts of this case in light of these principles reveals no abuse of discretion.

Plaintiffs initially sought both declaratory and damages relief on a theory of conversion. In order to establish their rights and sustain their claim, plaintiffs needed to plead facts showing, among other things, that they had an ownership interest in, and a right to possession of, the winning ticket. (See *Illinois Education Association v. Illinois Federation of Teachers* (1982), 107 Ill. App. 3d 686, 689 (setting forth the elements of conversion).) Plaintiffs attempted to make the requisite showing by relating facts which, if proved, would establish either that defendant gave the ticket to plaintiffs as a gift or that the parties had entered into an agreement whereby they were entitled to equal shares of any winnings. For the most part the amendments sought by plaintiffs merely expanded on these facts. More precisely, the amendments set forth more accurately and in greater detail the sequence of events surrounding the discovery of the winning ticket. The facts as amended were still directed only toward establishing a gift or an agreement for the purpose of showing plaintiffs' interest in the ticket. Thus, what defendant calls a change in theory of recovery

or, perhaps, addition of a new theory, is in reality merely part and parcel of the ownership element of plaintiffs' claim.

The "partnership theory of recovery" attacked by defendant was not new but had been part of plaintiffs' complaint from the start. Indeed, defendant must have recognized the pleading of an agreement since, in his answer, he denied any implication that the parties "reached any kind of agreement with respect to the proceeds of any winnings." Since the amendments did not add any new theories, and an agreement was pleaded by plaintiffs from the outset, the nature of the proof required to defend was not altered. Furthermore, in light of the nature of the amendments, defendant's claim of surprise, and implication of prejudice to himself, is not persuasive. In our view the modifications to plaintiffs' complaint constitute proper amendments to conform the pleadings to the proof.

We turn now to defendant's challenge to the trial court's findings. At the conclusion of the trial the court found that plaintiffs' evidence supported theories of both partnership and gift. Defendant points out that consideration, while an inherent element of a partnership, is not necessary to the making of a gift. He concludes that the concepts of gift and partnership are contradictory and insists that the court's inconsistent findings require that the judgment in favor of plaintiffs be vacated and the matter be remanded. We agree with defendant that the two concepts in question present certain inconsistencies but do not agree that such inconsistencies require vacation of the judgment in this case.

As we have mentioned, plaintiffs needed to show that they had a protectable interest in the winning ticket and/or the prize money won by the ticket. They sought to establish that interest by offering evidence of both a gift and an agreement. We recognize that the complaint does not set forth separate counts or a separate set of facts in support of each of the separate theories of recovery. Nor does it draw a clear distinction within itself between allegations directed toward a gift theory and those directed toward an agreement theory. However, there is no doubt the two propositions could have been presented as alternatives. It is permissible to argue in the alternative, even when such arguments are based on inconsistent facts and no individual argument is affected by any other. *Hillblom v. Ivancsits* (1979), 76 Ill. App. 3d 306, 311-12.

Had defendant made two separate and distinct arguments, the trial court could have responded in kind. In the absence of a clear delineation we think the trial court, in essence, merely acknowledged that evidence had been offered to support both theories and then, with-

out clearly embracing one proposition as opposed to the other, concluded that plaintiffs had established their right to the prize money. While it would have been more desirable for the trial judge clearly to delineate what he found to be the controlling facts, his failure to do so is not fatal to plaintiffs' cause. Defendant has not demonstrated how he has been prejudiced by the lower court's findings. Indeed, we do not believe he could show prejudice since the result would have been the same if the court had resolved the issue solely on the basis of either gift or agreement.

Defendant is not aided by *In re Marriage of Eltrevoog* (1982), 92 Ill. 2d 66, where one party filed a petition for separate maintenance and the other filed a counterpetition for dissolution of marriage. Both the separate maintenance statute and the dissolution of marriage statute required a finding of fault. The court found that each party had been guilty of mental cruelty toward the other and had proved the material allegations of his or her petition. The court then held the separate maintenance statute unconstitutional and granted relief to the spouse seeking dissolution. The supreme court reversed the holding of unconstitutionality, characterized the lower court's findings as totally inconsistent and wholly irreconcilable, vacated the judgment, and remanded for a new trial to allow consistent findings to be made in order to resolve the question of which spouse's petition was meritorious.

Unlike the findings in the instant case, the contradictory findings in *Eltrevoog* prevented a resolution of the controversy. The petitions were brought under different statutes, and each, if granted, would have a unique, and different, set of ramifications. Obviously, both parties could not prevail. Thus, absent a finding that one petition had merit as opposed to the other, the matter could not be settled, and both parties would be prejudiced. In the instant case the inconsistencies did not prevent resolution of the dispute. One party clearly prevailed, and it did not matter which theory the court chose to follow since, in either case, judgment would have been rendered in favor of plaintiffs with regard to their interest in the lottery prize money.

■ As a final matter defendant attacks the judgment on the ground that the evidence does not support the court's findings of either gift or partnership. As explained below, after reviewing the record we conclude that the finding of partnership was justified. Accordingly, we need not address defendant's challenge to the finding regarding gift.

After all the evidence had been presented and closing arguments completed, the trial court made the following remarks:

"In my opinion and the Court finds there is ample evidence in the record to support a theory of both partnership based on consideration and mutual amount of obligation and gift outright."

The trial judge expanded on his initial statement as follows:

"The defendant, whether viewed as a fiduciary or a partner or as a simple agent of a partnership, had a continuing duty to these plaintiffs."

And again, the court added:

"[I]t is very plausible that is indeed what happened. There was a joint enterprise, venture, or at least donated partnership under these circumstances."

While it is clear from these statements the court did not perceive the relationship between plaintiffs and defendant as a formal, legal partnership in the business sense, it is also clear the court decided that the parties had entered into a binding agreement which gave rise to rights and duties which the court could recognize and enforce. The court's conclusion is supported by the record.

■■ Whether a partnership exists is generally a question of fact to be resolved by the fact finder. (*Peterson v. Prince* (1981), 102 Ill. App. 3d 220, 224.) In a bench trial, the judge, as the trier of fact, is in a better position to determine the credibility of the witnesses and the weight to be given their testimony. (*Aetna Insurance Co. v. Amelio Brothers Meat Co.* (1989), 182 Ill. App. 3d 863, 865.) Accordingly, a reviewing court will not reverse a judgment unless the findings of the trial court are clearly contrary to the manifest weight of the evidence. (*Amoco Realty Co. v. Montalbano* (1985), 133 Ill. App. 3d 327, 333; *In re Estate of Elson* (1983), 120 Ill. App. 3d 649, 655.) A finding is against the manifest weight of the evidence only when an opposite conclusion is clearly evident. (*Commonwealth Edison Co. v. Department of Revenue* (1989), 179 Ill. App. 3d 968, 975.) A court of review may not overturn a judgment merely because it disagrees with it or might have reached a different conclusion had it been presented with the issue in the first instance. (*Schulenberg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356; *In re Estate of Elson* (1983), 120 Ill. App. 3d 649, 655.) In this case the trial court found that the parties had formed a partnership of some sort. In our opinion the evidence indicates that the arrangement between defendant and plaintiffs constituted a joint venture. A joint venture, as a practical matter, is essentially a partnership carried on for a single enterprise. *O'Connell v. Pharmaco* (1987), 164 Ill. App. 3d 68, 72.

■■ A joint venture is an association of two or more persons to carry out a single enterprise for profit. (*In re Johnson* (1989), 133 Ill.

2d 516, 525-26; *Smith v. Metropolitan Sanitary District* (1979), 77 Ill. 2d 313, 318.) Whether a joint venture exists is a question of the intent of the parties. (*United Nuclear Corp. v. Energy Conversion Devices, Inc.* (1982), 110 Ill. App. 3d 88, 109.) The elements to be considered in determining the parties' intent are: an agreement, express or implied, to carry on an enterprise; a demonstration of intent by the parties to be joint venturers; a joint interest, as reflected in the contribution of property, finances, effort, skill or knowledge by each party to the joint venture; a measure of proprietorship or joint control over the enterprise; and a provision for sharing of profits and losses. (*Dawdy v. Sample* (1989), 178 Ill. App. 3d 118, 126; *Ambuul v. Swanson* (1987), 162 Ill. App. 3d 1065, 1068.) A formal agreement is not essential to establish a joint venture. (*Barton v. Evanston Hospital* (1987), 159 Ill. App. 3d 970, 973.) Rather, the existence of a joint venture may be inferred from facts and circumstances demonstrating that the parties, in fact, undertook a joint enterprise. *Ambuul,* 162 Ill. App. 3d at 1068.

It could be inferred that the parties entered into an agreement and showed their intent to be joint venturers when they started playing the lottery together. Yurko invited plaintiffs, both verbally and by placing tickets in front of them, to play the lottery with him. Although it was refuted by Yurko, plaintiffs testified that he told them if they would help him scratch tickets they would be his partners and would share in any prize winnings. Plaintiffs expressed agreement with this proposal when they began scratching off the tickets.

The parties' intent to act jointly could be gleaned also from their subsequent conduct. There was testimony that both Judy and Frances uncovered tickets which were good for small cash prizes or more tickets. Neither defendant nor any of the plaintiffs tried to claim any of those prizes as their own. Rather, the tickets were turned in for more tickets, and plaintiffs kept on scratching. Also, all three plaintiffs testified that, after the winning ticket was revealed, there was a discussion amongst all the parties as to who would appear on the television show. Together, not individually, they decided that Yurko would be the one to go. Finally, although vehemently denied at trial, defendant himself impliedly acknowledged a joint effort when he printed the plaintiffs' initials right alongside his own name on the back of the winning ticket, again amidst talk that he and the plaintiffs were partners.

A joint interest in the effort to win the lottery, as shown by the parties' various contributions, could also be found from the evidence. Although there was a wide divergence as to how much money he actually spent, it is undisputed that Yurko paid for the tickets that were purchased. As for their contribution to the venture, Frances and Judy

expended their time and energy and put forth effort to scratch the tickets. While Phyllis' part in this is not altogether clear, her unrefuted testimony was that she scratched off a couple of tickets, and it is evident the other parties considered her part of the enterprise.

Finally, with regard to provision for sharing of profits, plaintiffs testified that Yurko told them they would share in anything that was won if they helped scratch the tickets. While Yurko denied this, he nevertheless later wrote plaintiffs' initials next to his own name on the line provided on the lottery ticket for the ticket holder's name. From this evidence the court could have found that the joint venturers had planned to share equally in any lottery prize ultimately won.

The accumulated evidence favorable to plaintiffs, if believed, warrants the conclusion that all the parties intended and agreed to the joint pursuit of a single enterprise, *i.e.*, a lottery prize. There is no question that the resolution of this dispute turned heavily on the credibility of the witnesses. Nor is there a question that the trial court found plaintiffs to be more credible than defendant. The judge referred to defendant's evidence as "extremely vague and inconsistent" and remarked that "defendant's story is not plausible under these circumstances." After emphasizing that he was well aware of the atmosphere and circumstances of the parties' gathering at Hitching-A-Ride, and of the results of things said freely and clearly in those circumstances, the court added, "there is no doubt what was intended, and I think that the Defendant's memory has failed him." Of plaintiffs' theory of the case the court remarked, "it is very plausible that is indeed what happened." In light of the trial court's determination regarding defendant's and plaintiffs' respective credibility, we cannot say a conclusion opposite to the one reached by the court is clearly evident. We see no reason to disturb the findings of the court below.

In summary, we recognize, as did the trial court, the circumstances which ultimately led to this dispute. We also acknowledge the informality of the arrangement between the plaintiffs and defendant. Nevertheless, the findings made by the trier of fact are amply supported by the record. Those findings warrant the conclusion, reached by the trial court, that the parties should be bound by the terms of their agreement to jointly carry out an enterprise for profit. A fiduciary relationship exists between members of a joint venture, and the conduct of joint venturers toward one another is governed by the legal principles pertinent to the relationship between partners. (*Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 437-38.) Like partners, joint venturers have a fiduciary duty to deal with each other with loyalty and good faith in regard to the enterprise. (*Ambuul v. Swanson*

(1987), 162 Ill. App. 3d 1065, 1070.) By its decision the trial court sought only to enforce defendant's already existing duty.

In accordance with the foregoing, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

McLAREN, J., concurs.

PRESIDING JUSTICE REINHARD, dissenting:

Because the record shows the existence of neither a partnership nor a valid gift, I respectfully dissent from the majority's affirmance of the trial court's judgment for plaintiffs.

The majority concludes that the parties here were engaged in a joint venture. A joint venture is essentially a partnership carried on for a single enterprise, and joint ventures are governed by partnership principles. (*Bachewicz v. American National Bank & Trust Co.* (1986), 111 Ill. 2d 444, 448.) Because a partnership is a contractual relationship, the principles of contract law fully apply to it. (*In re Estate of Johnson* (1984), 129 Ill. App. 3d 22, 25.) Consideration is a basic element for the existence of a contract. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 331.) Accordingly, a partnership agreement must be based on valid consideration between the partners. 59A Am. Jur. 2d *Partnership* §112 (1987).

Valid consideration for a contract centering on the purchase of legal lottery tickets has been found where each of the parties contributed tickets (*Miller v. Radikopf* (1975), 394 Mich. 83, 228 N.W.2d 386) or in the context of a long-standing pattern of joint ticket purchases (*Pearsall v. Alexander* (D.C. App. 1990), 572 A.2d 113). Here, where it is conceded that defendant alone purchased the lottery tickets, the majority's only suggestion of what might constitute consideration is the fact that plaintiffs "expended their time and energy and put forth effort to scratch the tickets." (212 Ill. App. 3d at 228.) However, the consideration supporting a unilateral promise such as the one present here must be that which is bargained for as consideration by the promisor. *Bank of Marion v. Robert "Chick" Fritz, Inc.* (1974), 57 Ill. 2d 120, 124.

The record simply does not support the conclusion that defendant bargained for plaintiffs' "time and energy" in scratching the tickets as their contribution to a joint venture or partnership. The evidence viewed most favorably to plaintiffs shows that defendant promised to share in the lottery winnings if plaintiffs helped him scratch the tick-

ets. The question, then, is whether the scratching of the tickets was intended to be consideration for a contract or merely a condition upon a gratuitous promise.

A promise may propose either a bargain or a gift, and in either case a condition may be imposed using the same words. (L. Simpson, *Handbook of the Law of Contracts* §53, at 84 (2d ed. 1965).) As a general rule, "if the happening of the condition will not only be of no benefit to the promisor but it is obviously merely for the purpose of enabling the promisee to receive a gift, the happening of the event on which the promise is conditional, though brought about by the promisee in reliance on the promise, will not properly be construed as consideration." 17A Am. Jur. 2d *Contracts* §115, at 131 (1991).

Here, I believe that defendant's invitation to plaintiffs to help him scratch the tickets was intended as simply a condition to their receipt of defendant's gift of lottery winnings. It strains credulity to find that plaintiffs' scratching of tickets was viewed by the parties as consideration supporting a partnership contract. I note that this conclusion does not contravene the general rule against inquiring into the adequacy of consideration, because that rule operates only where the parties actually intended a bargain. (L. Simpson, *Handbook of the Law of Contracts* §53, at 85 (2d ed. 1965).) Here, the evidence supports, at most, that defendant's promise constituted a conditional promise to make a gift of lottery winnings.

I further believe, however, that no valid gift has been effectuated. In addition to donative intent, the making of a valid gift requires the donor to part with exclusive dominion and control over the subject of the gift, and there must also be delivery. (*Frey v. Wubbena* (1962), 26 Ill. 2d 62, 72.) Here, whether the gift is viewed as the lottery ticket itself or the winnings it produced, defendant never parted with exclusive dominion and control. Moreover, even if the promise to share in the future lottery winnings could be construed as an attempt to effectuate a gift of those winnings, a promise to make a future gift is generally unenforceable (*Hux v. Woodcock* (1985), 130 Ill. App. 3d 721, 724) and is revocable at any time until the gift is executed (*Meyer v. Meyer* (1942), 379 Ill. 97, 104).

Accordingly, I would reverse the judgment of the trial court.