RIVERDALE BANK *et al.*, Plaintiffs-Appellants, v. HARRIET PAPA-STRATAKOS *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—92—3445

Opinion filed August 22, 1994.

32

Berger, Newmark & Fenchel, P.C., of Chicago (David J. Lloyd and Jason H. Katz, of counsel), for appellants.

William J. Sneckenberg & Associates, of Chicago (William J. Sneckenberg, of counsel), for appellee Nick Papastratakos.

Jenner & Block, of Chicago (Larry M. Wolfson and C. David Watson, of counsel), for appellee Sotirios Georgopoulos.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiffs-counterdefendants Riverdale Bank and Riverdale Bank Corporation, Inc. (Bank), appeal four orders of the trial court in connection with their claims against defendant Nick Papastratakos (Nick) and defendant-counterplaintiff Sotirios (Steve) Georgopoulos (Georgopoulos). We affirm.

## A. STIPULATED FACTS

The record includes the following stipulated facts. In July 1987, Georgopoulos owned a number of shares of stock in Emerson Radio Corporation. On Friday, July 17, 1987, Georgopoulos gave Andrew Nanos (Nanos) the Emerson stock, endorsed in blank. Nanos delivered the stock to Bernard Newman, an account representative at the Freehling Division of Cowen & Co. (Freehling), a stock brokerage firm. Freehling issued two checks totalling $84,024, each payable to the order of Georgopoulos, each post-dated July 20, 1987.

That same day, Nanos signed Georgopoulos' name on the two checks and delivered them to Harriet Papastratakos (Harriet). Harriet presented the two checks for payment at Riverdale Bank and received two cashiers checks, each in the amount of $42,012, and each payable to Pat Striglos and Angie Angelacos.

On or about September 2, 1987, Georgopoulos executed two forgery affidavits, concerning the checks.

## B. PROCEDURAL FACTS

The record shows that on or about September 9, 1987, Riverdale Bank received the forgery affidavits. Carrie Broughton, cashier and senior vice-president of Riverdale Bank, undertook an investigation of the matter and subsequently executed a criminal referral form, typing the word "forgery" as the crime committed. Broughton sent the criminal referral form to the Federal Bureau of Investigation (FBI), the office of the United States Attorney, and the Federal Reserve Board.

The Bank then filed a five-count complaint for declaratory judgment and other relief against Georgopoulos, Nanos, Harriet, Nick, American National Bank and Trust Company of Chicago, the First National Bank of Chicago, and Freehling. The Bank alleged that Nanos had forged Georgopoulos' signatures on the checks and that Harriet had breached her warranty that the endorsements on the checks were genuine. In addition, the Bank alleged that Nanos was Georgopoulos' agent; that Georgopoulos, Nanos, and Harriet had engaged in a fraudulent conspiracy to defraud the Bank; and that

Freehling and Georgopoulos had acted negligently, pursuant to section 3—406 of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1985, ch. 26, par. 3—406). The Bank sought to enjoin all defendants from collecting money from the Bank.

On April 28, 1988, Georgopoulos moved for summary judgment and requested sanctions against the Bank. On August 15, 1988, the trial court, Judge Roger Kiley presiding, granted Georgopoulos' motion for summary judgment. On August 30, 1988, the trial court entered a default judgment against Nanos and in favor of the Bank for failure to answer its complaint.

Meanwhile, on August 9, 1988, Nick filed a motion to dismiss under section 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—619), declaiming any responsibility for the actions of his mother, Harriet. Following a hearing on October 27, 1988, Judge Kiley entered an order dismissing the Bank's claim against Nick. On November 14, 1988, Nick filed a petition for an award of fees and costs pursuant to section 2—611 of the Code of Civil Procedure. Ill. Rev. Stat. 1987, ch. 110, par. 2—611.

Subsequently, Georgopoulos filed a counterclaim against the Bank for conversion. In response, the Bank filed an answer along with affirmative defenses, alleging that Georgopoulos and Nanos were joint venturers and, therefore, Nanos had full authority to negotiate on behalf of Georgopoulos and sign Georgopoulos' name to the checks. Georgopoulos filed a motion for summary judgment on the counterclaim which was denied by Judge Kiley's successor, Judge Monica D. Reynolds. Judge Reynolds set Georgopoulos' counterclaim for trial.

### C. TRIAL ON GEORGOPOULOS' COUNTERCLAIM

A trial on Georgopoulos' counterclaim commenced on October 19, 1989. Carrie Broughton testified on behalf of Georgopoulos that she knew Harriet as a customer of the Bank and had dealt with her individually for several years prior to 1987. In 1986, Broughton personally investigated a $30,000 overdraft on Harriet's account, concluding that it was a "kite," or overdraft. Subsequently, Broughton met with Harriet and informed her that for a specific time forward, the Bank would not honor any checks on her account except on a collected funds basis.

Broughton further stated that on July 13, 1987, Harriet attempted to negotiate a check from Freehling for $19,799.38. Bank records revealed that at that time, Harriet's account privileges were suspended, having been frozen from June 16 through July 15, 1987.

On July 17, 1987, Harriet endorsed, as a third party, two checks,

each in the amount of $42,012, each payable to Georgopoulos. The Bank did not collect any funds prior to honoring the checks. The Bank honored the two checks, post-dated July 20, 1987, in contravention of Bank policy of not honoring post-dated checks.

Broughton investigated each of the two $42,012 checks when she received a correction to return the money from American National Bank. At the conclusion of her investigation, Broughton executed a criminal referral report by typing in the word "forgery" as the description of the incident. Broughton then sent copies of the report to the FBI, the U.S. Attorney, and the Federal Reserve Bank. Broughton stated that she believed that Nanos had forged Georgopoulos' signatures on the two checks.

Broughton further stated that during the course of her investigation, she had a conversation with Harriet, which led her to conclude that Georgopoulos and Nanos had entered into a joint venture. However, she admitted that she did not know the legal elements of a joint venture. From that same conversation she further concluded that Nanos had forged Georgopoulos' name on the checks. Broughton took notes of her interview with Harriet, which she attached on continuation pages to the criminal referral form. Broughton had no independent knowledge whether what Harriet told her was the truth. Broughton stated that she knew that the signatures were forgeries because of Georgopoulos' affidavits of forgery she received from American National Bank.

On cross-examination, Broughton stated that under Federal Deposit Insurance Corporation (FDIC) procedures, when the Bank receives affidavits of forgery, it is required to turn the money over to the bank requesting payment. In this case, the Bank did not do that; instead, Broughton contacted legal counsel and the Bank entered into lawsuits.

Georgopoulos testified on his own behalf that he is the manager of the Beef and Brandy restaurant (restaurant) in Countryside, Illinois. Georgopoulos met Nanos at the restaurant in 1983.

Prior to July 1987, Georgopoulos owned approximately $90,000 in shares of Emerson stock (stock). As of July 1987, he planned to hold onto the stock. In July 1987, Georgopoulos had conversations with Nanos and Paul Chalmers at the restaurant concerning the stock. Georgopoulos agreed to put the stock up as collateral with Freehling.

Georgopoulos gave Nanos the shares of stock on the morning of July 17, 1987. Nanos was to take the stock to Freehling to put it up as collateral with his brother, Chris Nanos, a broker at Freehling, so Georgopoulos and Nanos could trade on different stock. Georgopoulos

never told Nanos that he could sell the stock and cash checks made payable to Georgopoulos. Georgopoulos and Nanos agreed that every trade was to be on Georgopoulos' account, and that Georgopoulos and Nanos were to split the profits. Georgopoulos understood that he alone would bear any losses from the trading.

At 11 a.m. on July 17, 1987, Nanos called Georgopoulos at the restaurant. They spoke in Greek for less than one minute. Nanos told Georgopoulos, "I am here with Mr. Newman at Freehling & Co. Mr. Newman wants to know if he has your permission for me to transfer the stock account which you have with Mr. Newman to Chris Nanos." Then Nanos said, "Okay. Now I'm going to put Newman on the phone." Georgopoulos told Newman, "Go ahead, transfer the account," and the conversation ended.

At around 2:30 p.m., Georgopoulos called Freehling to speak with Chris Nanos, but he was not available. Georgopoulos called again at 3 p.m. and spoke to Bernard Newman. He asked Newman if he had seen Nanos. Newman said, "He was here. He left."

That same day, and over the weekend, Georgopoulos attempted to reach Nanos by telephone, but to no avail. On Saturday, July 18, Georgopoulos received a confirmation in the mail from Freehling that the stock was sold.

Georgopoulos panicked and got very upset because the stock was not supposed to be sold. On Monday, July 20, 1987, Georgopoulos called Chris Nanos, but did not reach him. He then called Newman and asked him about the stock. Newman said he had not seen Nanos since Friday and stated that the stock was sold. Newman said he gave Nanos the checks and that they were made payable to Georgopoulos.

Georgopoulos again tried to reach Nanos but did not. Nanos came to the restaurant on the morning of Tuesday, July 21, 1987. Georgopoulos yelled at him, "Why did you sell my stock?" and asked for the checks. Nanos told Georgopoulos that he sold the stock because he needed the money and that he had to give the money to someone. Nanos stated, "As soon as I can, I will replace your stock. I will buy your Emerson stock, and I will give it back to you. Wait a day. Give me a day. Give me two days." For the next few weeks, Nanos came to the restaurant every other day and made this same promise. At no time did Nanos return Georgopoulos' stock or give Georgopoulos the proceeds from the sale of the stock.

Subsequently, Georgopoulos signed forgery affidavits on his belief that someone forged his signatures on the checks. Georgopoulos stated that he does not know Pat Striglos or Angie Angelacos, and that he never gave Nanos the authority to do anything on his behalf

other than make trades on margin, based on the Emerson stock as collateral.

On cross-examination, Georgopoulos stated he had bought shares of Emerson stock at different times between 1983 and 1987. He stated that he knew that Nanos was not a licensed broker. Georgopoulos gave the stock to Nanos, dated and endorsed in blank. While he agreed to split the profits of trade activity equally, Georgopoulos was not going to pay Nanos for his time.

Once he learned that Nanos had breached their agreement, he did not tell Nanos to stop payment on the checks. He waited approximately three weeks to see if he was going to get his money back. Georgopoulos did not sue Nanos, but filed the affidavits of forgery on September 2, 1987.

Bernard Newman testified on behalf of the Bank that he has been a stock broker with Freehling since 1961 and has handled Georgopoulos' account since 1981. On July 17, 1987, Georgopoulos sold a block of Emerson Radio securities. Nanos delivered the stock to Newman personally, and Newman sold it. Prior to selling the stock, Newman spoke to Georgopoulos, who stated, "Whatever Andy tells you, go ahead and do." Newman then followed Nanos' instructions to sell the stock.

The following Monday or Tuesday, Georgopoulos called and asked what was going on. Newman informed him that they sold the stock. Georgopoulos seemed surprised and "quite upset." Newman said, "I already gave a check to Andy for you, as was requested."

Later the same week, Georgopoulos called Newman looking for Nanos and asked for his money. Newman called Nanos and told him that Georgopoulos did not know that a check was issued to him and told Nanos to speak to Georgopoulos. Newman then placed a three-way call to Georgopoulos. While Newman was on the line, Georgopoulos and Nanos yelled at each other in Greek. Newman does not understand Greek. Nanos then asked Newman to buy the stock back, but Newman said he would not buy the stock back until it was paid for. Nanos said he would have the money in a few days and told Georgopoulos it would be taken care of, and the conversation ended.

On cross-examination, Newman stated that he understood that the Emerson stock belonged to Georgopoulos and not Nanos, and that only Georgopoulos would receive the proceeds if the stock was sold. Newman had Freehling make the proceed checks payable to Georgopoulos. He did not expect Nanos to keep or cash the checks.

On redirect examination, Newman stated that Nanos gave him the impression that he needed the checks for "some business venture Nanos was talking about with Georgopoulos." Following the testimony, the parties waived closing arguments.

On January 8, 1990, the trial court entered an order and accompanying memorandum of opinion, finding that under section 3—419(1)(c) of the UCC (Ill. Rev. Stat. 1985, ch. 26, par. 3—419(1)(c)), Nanos' endorsement of Georgopoulos' signature on two checks was not properly authorized. The trial court further found that no partnership or joint venture existed between Nanos and Georgopoulos for the purposes of authorizing endorsements on the two checks. The trial court entered judgment in favor of Georgopoulos in the amount of $84,024 plus interest.

On January 31, 1990, Georgopoulos filed a motion for sanctions against the Bank pursuant to Supreme Court Rule 137 (134 Ill. 2d R. 137) and section 2—611 of the Code of Civil Procedure (Ill. Rev. Stat. 1990, ch. 110, par. 2—611). On February 5, 1990, the Bank filed a motion to reconsider and vacate the order of January 8, 1990, and on April 16 and 18, 1990, filed motions to strike Nick's and Georgopoulos' motions for fees and sanctions. On June 4, 1990, the trial court held a hearing on the numerous motions of the parties. Following arguments of counsel, the trial court dismissed the Bank's complaint against Harriet.

On February 21, 1991, the trial court entered an order and written memorandum of opinion, imposing sanctions against the Bank, ordering reasonable attorney fees for Georgopoulos and Nick, and denying the Bank's motion to reconsider.

D. FEE HEARING

Subsequently, Georgopoulos and Nick filed petitions and supporting affidavits to determine the amount of reasonable attorney fees. A fee hearing commenced on September 24, 1991. At the hearing, attorney Jonathan Moses testified that he was responsible for all fees incurred by Nick since 1987 in connection with the lawsuit filed against him. Moses stated that his usual fee for commercial litigation at that time was $150 to $175 per hour; however, Moses offered to represent Nick at the lowest billing rate of $100 per hour. Moses requested that the court award him fees of $8,198.35 at the rate of $175 per hour, for a total of 46.65 hours.

David Watson, attorney with Jenner & Block, testified on behalf of Georgopoulos. Watson worked with attorney Larry Wolfson on the case. Watson explained that his firm keeps track of billing on a daily basis. Watson requested reimbursement of fees to Jenner & Block in the amount of $35,857.50.

On September 9, 1992, the trial court entered an order and memorandum of opinion, awarding Jenner & Block fees in the amount of $30,584.55 and awarding Moses fees in the amount of $6,997.50, based

on the rate of $150 per hour. The Bank filed a timely notice of appeal of all of the above final orders of the trial court on October 8, 1991.

Initially, the Bank contends that the trial court's finding that no joint venture existed between Georgopoulos and Nanos was against the manifest weight of the evidence.

A joint venture is an association of two or more persons to carry on a single enterprise for profit. (*Minyo v. Minyo* (1991), 220 Ill. App. 3d 746, 751, 581 N.E.2d 170, 173-74, citing *Herst, Inc. v. Chark* (1991), 219 Ill. App. 3d 690, 694.) The existence of a joint venture is inferred from the facts and circumstances with the intent of the parties being the most significant element. (*Minyo*, 220 Ill. App. 3d at 751.) Whether a joint venture exists is a question for the trier of fact, and the trial court's determination will only be reversed when it is contrary to the manifest weight of the evidence. *Minyo*, 220 Ill. App. 3d at 751.

The Bank argues that the record shows that "both Nanos and Georgopoulos made repeated statements indicating they were embarked upon a joint enterprise," and that "the parties' conduct and statements are understandable only when considered in the context of a joint venture." However, the record reflects that Nanos did not testify at the trial on Georgopoulos' counterclaim.

Citing to exhibit "SX 7f" contained in the supplemental record, the Bank argues that "Georgopoulos stipulated that he had been confronted by Nanos in September 1987 with the charge that Georgopoulos had always known that Nanos intended to loan the money to Striglos and Angelacos." The Bank states that "[t]he importance of this stipulated testimony cannot be overemphasized."

■ However, the record reveals that this alleged "stipulation" of Georgopoulos is actually part of the typewritten interview notes of Harriet Papastratakos, prepared by Carrie Broughton, and attached to the criminal referral form dated October 2, 1987. These interview notes do not contain *facts* stipulated to by the parties, but rather represent an exhibit agreed to by the parties as admissible at trial, as set forth in the filed "Stipulation of Facts and *Admissibility of Exhibits*" (emphasis added) as follows:

"9. The following Exhibits, copies of which are attached hereto, are admissible into evidence by and against either party:

* * *

g. Exhibit 7—Criminal Referral Form dated October 2, 1987."

The testimony at trial does not reveal clear evidence of a joint venture between Nanos and Georgopoulos. Broughton stated that during the course of her investigation, she had a conversation with Harriet, which led her to conclude that Georgopoulos had entered into a joint venture. However, Broughton further stated that she did

not know whether Harriet was telling the truth and that she did not know the legal elements of a joint venture.

Georgopoulos testified that he never agreed to sell the stock. Georgopoulos further testified that he never told Nanos that he could cash checks made payable to Georgopoulos. Georgopoulos understood that he alone would bear any losses resulting from the trading on his account. Georgopoulos testified that he panicked and got very upset when he learned about the sale because the stock was not supposed to be sold.

The Bank's only witness, Newman, testified that when he informed Georgopoulos that the stock was sold, Georgopoulos seemed surprised and "quite upset." Newman stated that he understood that the stock belonged to Georgopoulos and not Nanos, and that only Georgopoulos would receive the proceeds if the stock was sold. Newman had Freehling make the proceed checks payable to Georgopoulos. He did not expect Nanos to keep or cash the checks. Although Newman testified that Nanos "gave him the impression" that Nanos needed the checks because of "some business venture" Nanos was talking about with Georgopoulos, this testimony is not enough to determine that the finding of the trial court, that no joint venture existed, is against the manifest weight of the evidence.

Georgopoulos further testified that he told Newman, "Go ahead, transfer the account," and Newman testified that Georgopoulos told him, "whatever Andy tells you, go ahead and do." However, this contrary testimony is not sufficient to reverse the finding of the trial court. Under circumstances where the trial court has heard and observed the witnesses and their testimony is contradictory, a reviewing court will not substitute its judgment for that of the trial court as to the credibility of witnesses. *Erie Casein Co. v. Anric Corp.* (1991), 217 Ill. App. 3d 602, 606-07, 577 N.E.2d 892, 895.

Because the evidence at trial did not support the Bank's theory of a joint partnership, the trial court correctly determined that no joint venture existed and that Nanos had illegally forged Georgopoulos' signature on the checks.

Next, the Bank contends that the trial court improperly excluded from evidence statements of Nanos, quoted during Newman's deposition, wherein Newman agreed that Nanos told him that Georgopoulos approved of and knew of Nanos' conduct.

The record reveals during direct examination of Newman, counsel for the Bank asked Newman if he recalled testifying as to a three-way conversation between Newman, Nanos and Georgopoulos during his deposition. The Bank's counsel then read into the record the following statement of Newman, which appeared on page 34 of Newman's deposition:

"And Mr. Nanos said: 'Steve knows exactly what's going on and I already spoke to Steve. Don't worry about it. Everything is okay.' " The trial court sustained Georgopoulos' objection to this evidence as hearsay.

The Bank admits that this and other proposed statements are hearsay, but argues that the statements are admissible because they are the statements of a party opponent, *i.e.*, joint venturer. The Bank claims that "[t]hese statements would have indisputably and conclusively established that Georgopoulos had full prior knowledge of Nanos' actions and that Georgopoulos had approved of them."

■ Georgopoulos responds that the Bank waived its objection to the exclusion of this evidence by failing to make an offer of proof at trial. An offer of proof enables the reviewing court to determine whether the exclusion was erroneous and harmful, as it discloses the nature of the offered evidence. (*Hopkinson v. Chicago Transit Authority* (1991), 211 Ill. App. 3d 825, 849-50, 570 N.E.2d 716.) The record indicates that the Bank failed to make an offer of proof of the excluded evidence at trial.

In addition, the record shows that Newman testified both in his deposition and at trial that, after his introduction on the three-way call, Nanos and Georgopoulos "yelled at each other in Greek," and Newman did not understand what they were saying. Under these circumstances, we find that the Bank has waived this issue for review.

Next, the Bank contends that the trial court erroneously found that sanctions were warranted against the Bank. The February 21, 1991, order of the trial court stated, "specific allegations of Riverdale Bank's bad faith in this matter were alleged. Sanctions are warranted." The order called for an award of reasonable attorney fees. The Bank argues that Georgopoulos and Nick fail to state a claim for sanctions in their respective motions, as required under Supreme Court Rule 137 (134 Ill. 2d R.137), and therefore both motions should have been stricken by the trial court.

Rule 137 became effective August 1, 1989, and preempted all matters sought to be covered by section 2—611 of the Code of Civil Procedure. (*Olsen v. Staniak* (1994), 260 Ill. App. 3d 856, 860; *In re Marriage of Sykes* (1992), 231 Ill. App. 3d 940, 946, 596 N.E.2d 1226.) The record shows that Nick filed his motion for sanctions on November 14, 1988, and therefore section 2—611 is applicable, while Georgopoulos filed his motion on January 31, 1990, requesting sanctions under both section 2—611 and Rule 137. Section 2—611 differs from Rule 137 only in that the latter grants the court discretion to impose a sanction, even if a violation is found, whereas the former required the imposition of a sanction. The trial court's

discretionary imposition of sanctions under Rule 137 will not be reversed on appeal absent a clear abuse of discretion. *In re Marriage of Pitulla* (1993), 256 Ill. App. 3d 84, 90, 628 N.E.2d 563.

In this case, Georgopoulos initially requested sanctions in a motion filed on April 28, 1988. There, Georgopoulos identified specific misconduct on the part of the Bank, citing examples of bad faith, including misleading the court as to the date the Bank received the forged checks and ignoring the clear procedures of the UCC regarding a bank's responsibility to take the loss for a forged endorsement. In his subsequent motion for sanctions filed on January 31, 1990, Georgopoulos further specified that the Bank knew that its allegations of conspiracy, authorization, joint venture, and negligence were false prior to filing its complaint on October 14, 1987, based on the fact that Carrie Broughton filed a criminal referral report concluding forgery on October 2, 1987.

Similarly, Nick alleged in his motion for attorney fees and costs that the Bank's misrepresentations of fact to the trial court caused him to be erroneously named as a defendant in the Bank's complaint. Nick stated that the Bank knew that he was not liable for Harriet's breach of the warranty of endorsement, but nevertheless proceeded against him.

The evidence at trial reveals that prior to filing the complaint against defendants, the Bank conducted an investigation, determined that the signatures were forgeries, and filed the criminal referral form with Federal authorities.

The Bank argues that matter in the pleadings as stated above was insufficient, and that the trial court erred in failing to hold a separate hearing on all of the motions for sanctions, as required by Rule 137.

A hearing under Rule 137 affords the parties the opportunity to place before the court facts which it may rely upon in making an informed and reasonable decision. (*Olsen*, 260 Ill. App. 3d at 862.) Whether a hearing must be held to determine if the allegations are without reasonable cause depends upon the circumstances presented in each case. (*Beno v. McNew* (1989), 186 Ill. App. 3d 359, 365-66, 542 N.E.2d 533.) However, this court determined that a separate hearing on sanctions under section 2—611 is not necessary where the pleadings and evidence at trial demonstrate that the offending allegations were made without reasonable cause and were untrue. (*Beno*, 186 Ill. App. 3d at 366; *Fried v. Barad* (1989), 187 Ill. App. 3d 1024, 1029, 543 N.E.2d 1018, 1022.) This court has determined that no language in Rule 137 modifies the requirements under which the court should hold an evidentiary hearing. *Olsen*, 260 Ill. App. 3d at 862.

■ We find that the assertions in the pleadings and the evidence at trial provided a sufficient basis for the court to determine that the statutory requirements for imposition of sanctions were met. The record reveals that the Bank made unsupported factual and legal assertions, and that it knew prior to filing the complaint against defendants that Nanos had forged Georgopoulos' signature on the checks. We therefore find that the record supports the trial court's imposition of sanctions against the Bank for its bad faith actions.

Finally, the Bank contends that the trial court erroneously calculated and awarded attorney fees to the defendants. The Bank argues that defendants failed to establish their entitlement to attorneys fees requested, and that the trial court erred in calculating the fee award. The Bank disputes Nick's award based on the rate of $150 per hour when Moses testified that he agreed to represent Nick at the rate of $100 per hour. The Bank further argues that Georgopoulos' attorneys "lumped" time together and could not account for certain time entries.

Rule 137 is penal in nature, and its provisions must be strictly construed. (*In re Marriage of Sykes* (1992), 231 Ill. App. 3d 940, 946.) The purpose of Rule 137, like that of its predecessor, section 2—611, is to penalize litigants who plead frivolous or false matters or bring suit without any basis in law. (*In re Estate of Wernick* (1989), 127 Ill. 2d 61, 77, 535 N.E.2d 876, 883.) The isolated focus on each reimbursable component part of preparation and trial is not necessary where false allegations made without reasonable cause are determined to be the cornerstone of the entire baseless lawsuit. *Dayan v. McDonald's Corp.* (1984), 126 Ill. App. 3d 11, 466 N.E.2d 945.

■ In the present case, the Bank stated a claim alleging that the named defendants had engaged in criminal activities, *i.e.*, a conspiracy to commit fraud, despite the Bank having duly reported to the proper authorities the existence of a forgery. The trial court found that the Bank's lawsuit was motivated by bad faith, and after a hearing on the reasonableness of the fees requested, issued a carefully considered memorandum of opinion, reducing the fees requested where necessary. Under the special facts and circumstances of this case, the trial court was correct in rejecting a $100-per-hour limitation on Nick's fees and in awarding fees to Georgopoulos' attorneys. We therefore find the fees awarded to be reasonable.

For the reasons stated above, the judgment of the trial court is affirmed.

Affirmed.

BUCKLEY and MANNING, JJ., concur.