CHRISTINE THOMPSON, as Adm'r of the Estate of Sean Thompson, Deceased, Plaintiff, v. RICHARD HITER, Defendant (Robert P. Reske, Petitioner-Appellee; Ambrose and Cushing, P.C., Respondent-Appellant).

First District (1st Division)   No. 1—03—2918

Opinion filed March 14, 2005.

John C. Ambrose, F. John Cushing III, and Michael M. Cushing, all of Ambrose & Cushing, P.C., of Chicago, for appellant.

Robert P. Reske, of Law Offices of Robert P. Reske, P.C., of Park Ridge, for appellee.

JUSTICE GORDON delivered the opinion of the court:

This matter arises out of a claim for attorney fees resulting from the settlement of a wrongful death case. On June 9, 2003, Robert P. Reske filed a verified petition to adjudicate an attorney lien claimed by respondent, Ambrose & Cushing, P.C. (the Firm). Reske claimed the Firm was entitled only to *quantum meruit* fees for the work Reske performed on the case while an employee of the Firm. The Firm claimed it was entitled to two-thirds of the entire attorney fee based

on an oral joint venture agreement between the Firm and Reske. After an evidentiary hearing, the trial court found that the evidence was insufficient to support the Firm's contention that a joint venture existed between the Firm and Reske and awarded the Firm *quantum meruit* fees in the amount of $6,990. The Firm now appeals. The issue before the court on appeal is whether the trial court was correct in holding that the discharge of the Firm prior to settlement relieved Reske of his fee-sharing obligation under his agreement with the Firm. For the reasons that follow, we affirm.

## STATEMENT OF FACTS

In a verified petition filed on June 9, 2003, Reske alleged the following. From September 1997 until December 2001, Reske was employed by the Firm under an oral employment contract. For all new business Reske brought to the Firm, Reske received one-third of the attorney fees generated on those files and the Firm received two-thirds. The Firm provided Reske with malpractice insurance, secretarial and clerking services, and covered Reske's files if needed. In 2001, Reske was paid a base salary of $66,000 to work on the Firm's cases.

Reske further alleged that, on June 26, 2001, Christine Thompson, as administrator of the estate of Sean Thompson (plaintiff), entered into a contingent fee contract with the Firm and Reske to represent her in her claim against Richard Hiter for the wrongful death and survival action of her minor son, Sean Thompson (the Thompson wrongful death case). Reske was the only attorney who did any work on the Thompson wrongful death case from June 26, 2001, through December 6, 2001, and Reske made all legal decisions regarding the handling of the case. By letter dated January 13, 2002, plaintiff discharged the Firm. Reske continued his representation of plaintiff. By letter dated January 22, 2002, the Firm demanded payment from Reske of $4,204.50 for its costs before turning over plaintiff's file. On January 22, 2002, Reske paid the Firm $4,204.50 for the release of plaintiff's file. On February 6, 2002, the trial court entered an order granting the Firm leave to withdraw its appearance and granting Reske leave to substitute as counsel.

Reske further alleged that, by letter dated May 30, 2003, he asked the Firm to produce the costs paid on the Thompson file and to calculate the hours spent on the file which would entitle the Firm to compensation on a *quantum meruit* basis. By letter dated June 2, 2003, the Firm demanded $155,556 in fees, which represents two-thirds of the entire fee earned on the Thompson wrongful death case.

On June 27, 2003, after filing his verified petition, Reske submit-

ted a distribution and settlement order for the Thompson wrongful death case to the trial court. The trial court approved the settlement in the amount of $700,000 and found that Reske was entitled to $233,333.33 in fees. Nevertheless, the trial court ordered that those fees be held in trust by Reske pending the trial court's resolution of Reske's petition to adjudicate the Firm's attorney lien.

On July 7, 2003, the Firm filed a response to Reske's petition. The Firm requested that the trial court deny Reske's request that the Firm receive only a *quantum meruit* award and asserted that the trial court should instead determine that a joint venture existed between Reske and the Firm.

In August 2003, the trial court held evidentiary hearings on Reske's petition and the following relevant testimony was presented. Laura Kohniak, formerly a legal secretary with the Firm, testified that while at the Firm she was assigned by John Cushing to work on the Thompson wrongful death case. Kohniak stated that there were two Thompson files: one file related to a bicycle accident that Sean Thompson had in May 2001 (the Thompson bicycle case) and the other file related to Sean's electrocution and death (the Thompson wrongful death case). Kohniak stated that she was the only secretary who worked on the Thompson files and Reske was the only attorney who worked on the Thompson files. Kohniak's workstation was located directly outside of Reske's office.

The Thompson bicycle case was settled by Reske in November 2001. According to Kohniak, when Christine Thompson arrived at the Firm to pick up the settlement check, she went into Reske's office. Less than a minute later, Cushing interrupted Thompson and Reske and escorted Thompson to his office for a meeting, excluding Reske. When the meeting ended, Thompson, who appeared to be upset, walked back into Reske's office and told him the content of her conversation with Cushing. Kohniak heard Thompson tell Reske that Cushing told her he had taken over the wrongful death case and that Reske would no longer be working on the case. Kohniak also heard Thompson tell Reske that she informed Cushing that if Reske was not going to be doing the work on the wrongful death case, she was going to fire the Firm and hire a different firm to represent her.

Kohniak was later told by Cushing that he was now handling the Thompson wrongful death, that Reske was not to do any further work on the file, and that all phone calls regarding the case were to be forwarded to Cushing. Cushing also told Kohniak that Reske was not to receive fees on either Thompson case. Reske was subsequently fired. Kohniak was instructed that in the event anyone phoned regarding the Thompson cases, or any of the cases Reske handled, she was to

tell them that Reske left the firm and that they should talk to Cushing.

Kohniak also testified that Reske told her about his agreement with the Firm. Specifically, Reske told her that the Firm provided him with secretarial services and that he agreed to split the fees on cases involving his clients. She was also told by Reske that in the event he left the Firm, he was entitled to take his cases with him and had to pay the Firm only the court fees owed.

Christine Thompson testified that she was referred to Reske when her son Sean had a bicycle accident in May 2001. Thompson signed a contract which provided, in pertinent part: "I hereby retain and employ AMBROSE & CUSHING, P.C., and Robert P. Reske, attorneys with offices at 221 North LaSalle Street, Suite 1748, Chicago, Illinois 60601 to represent me ***." Prior to signing the contract, Thompson asked Reske whether she would have to pay the attorney fee twice because Ambrose & Cushing was included on the form. Reske explained to her that the Firm was included on the contract because he was the Firm's employee. Thompson told Reske that she wanted him to handle the case. Thompson was agreeable, however, to an attorney from the Firm stepping in if needed. Thompson believed that if Reske left the Firm, he could take the case with him and he would still be her attorney.

Thompson further testified that after Sean had his electrocution accident, she hired Reske to handle the wrongful death case. Thompson again signed a contract which provided: "I hereby retain and employ AMBROSE & CUSHING, P.C., and Robert P. Reske, attorneys with offices at 221 North LaSalle Street, Suite 1748, Chicago, Illinois 60601 to represent me ***."

Sometime in December 2001, Thompson went to the Firm's office to pick up a settlement check for the bicycle case. When she arrived, she was asked by Cushing if Ted Dymanus was the person who had recommended Reske to her. She said yes. Cushing informed her that since Ted Dymanus was the referring attorney, Cushing was going to handle the wrongful death case. As she was leaving the Firm, Thompson told Reske that if he was not going to be her attorney, she was going to hire another firm. When Thompson later phoned the Firm to speak with Reske, she was told he no longer worked for the Firm.

Thompson testified that in January 2002, someone from the Firm (either Cushing or Ambrose) came out to her house. Thompson's impression was that this individual was asking her to fire Reske and hire the Firm. Thompson told the individual that she wanted to be represented by Reske. Sometime thereafter, Thompson sent a letter to the Firm, which stated:

"It is our understanding that Bob Reske is no longer associated with your law firm. Mr. Reske is the attorney we hired to represent us in our law suit. We want him to continue representing us in our lawsuits. Therefore we are firing the law firm of Ambrose & Cushing.

Please do whatever has to be done for you to withdraw as my attorneys, for Bob Reske to continue representing us and to immediately deliver our file to him.

We do not want to have any further communication with you."

The Firm attempted to contact her but she did not return the calls.

John Cushing testified that he is a partner in the Firm. Cushing testified that the Firm consists of himself, John Ambrose and a few associates. Cushing testified regarding his relationship with Reske. Sometime in the mid-1980s, while Reske was working for the City of Chicago, Reske began working with the Firm on cases that Reske brought to the Firm. At that time, the cases were filed over the Firm's name and Reske would do some of the work on the case. The Firm handled the expenses out of pocket. Reske would come to the Firm about once a week and discuss what needed to be done on a particular case. All the work was shared between the Firm and Reske. When the cases settled, the Firm received two-thirds of the fee and Reske received one-third of the fee.

Cushing testified that in 1997, the Firm opened up its offices to Reske. The Firm provided Reske with a secretary and an office. The Firm paid Reske a salary, paid various association dues on his behalf, and paid his attorney registration fees. The Firm also reimbursed Reske for health insurance. In addition, the Firm paid all the expenses on its cases and on cases brought in by Reske. Reske worked on both the Firm's cases and his own. Cushing testified that with respect to cases brought in by Reske, the relationship between the Firm and Reske never changed. According to Cushing, Reske was both an employee and a venture partner.

Cushing testified that during the time Reske was an employee, the office would meet regularly to discuss cases. With respect to Reske's cases, Cushing, Ambrose and Reske would meet to discuss all aspects of the cases, including expenses, potential experts, potential claims, target defendants, and insurance coverage. Cushing stated that they all shared in the decision on how much money to spend on a particular case.

Cushing stated that the Firm has three different contingency contracts: one contract retains the Firm exclusively; one contract retains the Firm exclusively but identifies the referring attorney; and one contract retains the Firm and Reske jointly.

On cross-examination, Cushing agreed that if Reske left the firm, the client had the freedom to go with Reske. However, Cushing denied that the Firm had an agreement with Reske that should a client leave with Reske, Reske's only obligation was to pay the costs of the file. Cushing also denied telling Kohniak, in December 2001, that Reske no longer had control of the Thompson files or that Reske would not be receiving attorney fees on the files.

Reske testified next. Reske's testimony was consistent with the allegations in his verified complaint, and with the testimony of Kohniak and Thompson.

On September 24, 2003, the trial court issued its memorandum opinion and order finding that "[t]he [F]irm's contention that they had an oral joint venture agreement is not supported by the evidence." The trial court stated:

> "The evidence illustrates that although the parties intended to associate with one another for the purpose of jointly representing the Thompsons, when Reske was a member of the [F]irm, the [F]irm cannot illustrate by a preponderance of the evidence as to what is more probably true than not, that the relationship was to continue after Reske left the [F]irm and the [F]irm was discharged as attorneys for the Thompsons. Although at the time of the initial representation of the Thompsons, there may have been a community of interest in the purpose of the joint association. The right of each party to direct and govern the policy and conduct of the other members did not exist. Reske was an employee of the [F]irm and they had the ultimate right to direct the policy and conduct of the file. There really was not the right of joint control and management because Reske as an employee had to follow the policies of the [F]irm and the directions of his superiors. Based on the evidence presented, the Court cannot find that it is more probably true than not that any agreement existed after the [F]irm was terminated by the Thompson and, as a result, the [F]irm is entitled only to quantum meruit."

The Firm now appeals.

## ANALYSIS

The issue before the court on appeal is whether the trial court was correct in holding that the discharge of the Firm prior to settlement relieved Reske of his fee-sharing obligation under his agreement with the Firm.

■ Reske argued in his petition for adjudication of attorney lien, and argues now before us, that the Firm is entitled to only a *quantum meruit* award because it was discharged by Thompson. It is well settled that a client may discharge her attorney at any time, with or without

cause. *Rhoades v. Norfolk & Western Ry. Co.*, 78 Ill. 2d 217, 227-28, 399 N.E.2d 969, 974 (1979); *Much Shelist Freed Denenberg & Ament, P.C. v. Lison*, 297 Ill. App. 3d 375, 378, 696 N.E.2d 1196, 1199 (1998). When a client fires her attorney, the contingent fee contract ceases to exist, and the contingency term is no longer operative. *In re Estate of Callahan*, 144 Ill. 2d 32, 40, 578 N.E.2d 985, 988 (1991); *Much Shelist Freed Denenberg & Ament, P.C.*, 297 Ill. App. 3d at 379, 696 N.E.2d at 1199. Nevertheless, a discharged attorney may be compensated for the services rendered before the discharge on a *quantum meruit* basis. *Rhoades*, 78 Ill. 2d at 230, 399 N.E.2d at 974-75; *Much Shelist Freed Denenberg & Ament, P.C.*, 297 Ill. App. 3d at 378-81, 696 N.E.2d at 1199-1201. In *quantum meruit* recovery, the former client is liable for the reasonable value of the services received during the attorney's employment. *Callahan*, 144 Ill. 2d at 41, 578 N.E.2d at 989; *Much Shelist Freed Denenberg & Ament, P.C.*, 297 Ill. App. 3d at 379, 696 N.E.2d at 1199.

Notwithstanding the foregoing, the Firm argues it is entitled to a two-thirds award. The Firm bases its claim to fees on its relationship with Reske. The Firm contends that its relationship with Reske was that of a joint venture. According to the Firm, if we were to find that it had engaged in a joint venture with Reske, its entitlement to fees would be governed by the same legal rules that govern partnerships. According to the Firm, the rule restricting a discharged attorney from recovering a contingent fee does not apply to partnerships and, therefore, does not apply to a joint venture. For the reasons discussed below, we reject the conclusion urged by the Firm.

The Uniform Partnership Act provides that the dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business. 805 ILCS 205/29 (West 2000). Upon dissolution, the partnership is not terminated but rather continues until the winding up of partnership affairs is completed. 805 ILCS 205/30 (West 2000). The Firm contends that based on partnership law, the fact that Thompson discharged the Firm has no effect on its agreement with Reske because the joint venture continued notwithstanding its dissolution.

The trial court agreed that the Firm's right to an award of two-thirds of the attorney fees hinged on whether the Firm and Reske had entered into a joint venture but found that no such joint venture was established. While we concur with the overall result reached by the court, we disagree with the court's conclusion that there was no joint venture between the Firm and Reske and we also disagree with the Firm's assertion that had there been a joint venture this would have

entitled it to a two-thirds award based on the application of partnership principles.

■ A joint venture is defined as "an association of two or more persons to carry out a single enterprise for profit." *In re Johnson*, 133 Ill. 2d 516, 525-26, 552 N.E.2d 703, 707 (1989). "[G]enerally speaking, it may be said that practically the only distinction between the two [a joint venture and a partnership] is that the former relates to a single specific enterprise or transaction, while the latter relates to a general business of a particular kind." *Harmon v. Martin*, 395 Ill. 595, 612, 71 N.E.2d 74, 83 (1947). "A formal agreement is not essential to establish a joint venture." *Fitchie v. Yurko*, 212 Ill. App. 3d 216, 227, 570 N.E.2d 892, 900 (1991). The existence of a joint venture may be inferred from circumstances demonstrating that the parties in fact entered into a joint venture. *O'Brien v. Cacciatore*, 227 Ill. App. 3d 836, 843, 591 N.E.2d 1384, 1389 (1992). The intent of the parties is the most significant element to be considered. *O'Brien*, 227 Ill. App. 3d at 843, 591 N.E.2d at 1389. Whether a joint venture exists is a question for the trier of fact, and the trial court's determination will only be reversed when it is contrary to the manifest weight of the evidence. *Riverdale Bank v. Papastratakos*, 266 Ill. App. 3d 31, 39, 639 N.E.2d 219, 225 (1994).

In its memorandum opinion and order, the trial court considered the following four elements in determining whether a joint venture existed between the Firm and Reske: (1) a community of interest in the purpose of the joint association; (2) a right of each member to direct and govern the policy of conduct of the other members; (3) a right to joint control and management of the property used in the enterprise; and (4) a sharing in both profit and losses citing to *Kaporovskiy v. Grecian Delight Foods, Inc.*, 338 Ill. App. 3d 206, 787 N.E.2d 268 (2003), *Herst v. Chark*, 219 Ill. App. 3d 690, 579 N.E.2d 990 (1991), *Behr v. Club Med, Inc.*, 190 Ill. App. 3d 396, 546 N.E.2d 751 (1989), *Barton v. Evanston Hospital*, 159 Ill. App. 3d 970, 513 N.E.2d 65 (1987), and *Clapp v. JMK/Skewer, Inc.*, 137 Ill. App. 3d 469, 484 N.E.2d 918 (1985).[1] After considering these elements, the trial court held that

---

[1]Other cases state that the elements to be considered in determining whether the parties intended a joint venture are: (1) an express or implied agreement to carry on an enterprise, (2) a manifestation of intent by the parties to be associated as joint venturers, (3) a joint interest, as reflected in the contribution of property, finances, effort, skill or knowledge by each party to the joint venture, (4) a measure of proprietorship or joint control of the enterprise, and (5) a provision for the sharing of profits or losses. See, *e.g.*, *Yokel v. Hite*, 348 Ill. App. 3d 703, 709, 809 N.E.2d 721, 727 (2004); *O'Brien*,

"[t]he [F]irm's contention that they had an oral joint venture agreement is not supported by the evidence." The trial court stated:

> "The evidence illustrates that although the parties intended to associate with one another for the purpose of jointly representing the Thompsons, when Reske was a member of the [F]irm, the [F]irm cannot illustrate by a preponderance of the evidence as to what is more probably true than not, that the relationship was to continue after Reske left the [F]irm and the [F]irm was discharged as attorneys for the Thompsons. Although at the time of the initial representation of the Thompsons, there may have been a community of interest in the purpose of the joint association. The right of each party to direct and govern the policy and conduct of the other members did not exist. Reske was an employee of the [F]irm and they had the ultimate right to direct the policy and conduct of the file. There really was not the right of joint control and management because Reske as an employee had to follow the policies of the [F]irm and the directions of his superiors. Based on the evidence presented, the Court cannot find that it is more probably true than not that any agreement existed after the [F]irm was terminated by the Thompsons and, as a result, the [F]irm is entitled only to quantum meruit."

We now review each element in turn.

■ With respect to the first element, it is clear from the court's opinion that the court found that Reske and the Firm "intended to associate" and that they shared a "community of interest" with respect to the Thompson wrongful death case. Given the facts of this case, where a law firm and an attorney are named on a contingent fee contract to represent a client, it would be difficult, if not impossible, to conclude that the parties did not intend to associate or did not share a community of interest with respect to that client. Thus, there is no question that the first element is met.

With respect to the second and third elements (*i.e.*, whether there was a right of each party to direct and govern the policy and conduct of the other members and whether there was a right of joint control and management), we conclude that the trial court's finding that these elements were not present was against the manifest weight of the evidence. The Firm and Reske presented Thompson with a contingent fee contract that provided in part: "I hereby retain and employ AMBROSE & CUSHING, P.C., and Robert P. Reske, attorneys with offices at 221 North LaSalle Street, Suite 1748, Chicago, Illinois 60601 to represent me ***." When Thompson signed this contingent

227 Ill. App. 3d at 843, 591 N.E.2d at 1389; *Fitchie*, 212 Ill. App. 3d at 227, 570 N.E.2d at 900.

fee agreement, she vested both the Firm and Reske with authority to "represent [her] for the purpose of prosecuting or settling all claims" and "to incur reasonable expenses in connection with the settlement or prosecution of th[e] claim." Based on the contingent fee agreement alone, the Firm and Reske shared a right to direct and govern the policy and conduct of the other members as well as a right to joint control and management with respect to the Thompson wrongful death case. There was also testimony presented that requires this conclusion. Cushing testified that with respect to the cases Reske brought to the Firm, Cushing, Ambrose and Reske would meet to discuss all aspects of the cases, including expenses, potential experts, potential claims, target defendants, and insurance coverage. Cushing stated that they all shared in the decision on how much money to spend on a particular case. Cushing characterized it as a "group approach." No one had "absolute control." We reject Reske's argument that because he was an employee, the Firm "had the ultimate right to direct the policy and conduct of the file [and that] [t]here really was not the joint control and management." This statement is contradicted by his statement in his verified petition that he "was the only attorney who did any legal work on the [Thompson case] and made all legal decisions regarding the handling of [the] file." Reske cannot argue that the Firm had the right to direct the policy and conduct of the file while at the same time assert that he made all the legal decisions regarding the handling of the file.

The fact that Reske was ultimately hired by the Firm as an employee should have no bearing on whether he and the Firm were joint venturers with respect to the Thompson wrongful death case. At the time he was hired, there is no dispute that his status as an employee with respect to the general business of the Firm was overtly disassociated from his status with respect to the cases that Reske himself brought in the Firm. As noted, Reske's relationship with the Firm commenced in 1986, long before he became an employee, with respect to Reske's private clients. While no written agreement or contract was ever entered into between the parties, Cushing maintained that from 1986 to 1997 the Firm provided Reske with office space, clerical and legal assistance, and financial backing in exchange for two-thirds share of any profits generated on any of Reske's cases. In 1997, Reske entered into an employment agreement with the Firm, which continued through December 2001, pursuant to which he received $66,000 per year in salary to work on the Firm's files. With respect to clients he brought to the Firm, Reske continued under his preexisting arrangement to receive one-third of the attorney fees generated and the Firm continued to receive two-thirds of the at-

torney fees generated; the original agreement did not change. There is no evidence leading to a conclusion that the preexisting relationship between Reske and the Firm with respect to cases Reske brought into the Firm was modified in any respects after he became a salaried employee in 1997. Furthermore, the contingent fee contract signed by Thompson names both the Firm and Reske. This conclusion is bolstered by the fact that the Firm has three different contingency contracts: one contract retains the Firm exclusively; one contract retains the Firm exclusively but identifies the referring attorney; and one contract retains the Firm and Reske jointly. Arguably, if Reske's status was merely that of an employee, it would be anomalous to name him separately in the contingent fee agreement apart from the Firm. Thus, to the extent the court relied on Reske's status as an employee to determine whether the Firm could prove the elements of a joint venture, we believe the court's analysis to be flawed.

There is also evidence present to satisfy the fourth element cited by the trial court (but not addressed in its order), "a sharing in profit and losses." The Firm and Reske had an agreement to split the attorney fees on cases brought in by Reske, including the Thompson wrongful death case. In addition, both parties shared in a loss if there was no recovery; the Firm lost any expenses paid and Reske lost the time invested in the case.

A case can be made further that with respect to lawyers and clients, the key factor to consider in determining the existence of a joint venture is whether the client named each of her attorneys in the initial contingent fee agreement. Having done so, they are deemed to be in a joint venture with respect to that transaction without necessitating any further analysis as to the existence of the four elements upon which the trial court relied. See *In re Johnson*, 133 Ill. 2d 516, 552 N.E.2d 703 (1989). In *Johnson*, our supreme court addressed whether a joint venture relationship arises between an attorney and a law firm whom the client retained to jointly represent his case. There, attorney Johnson agreed to represent the plaintiff in connection with a claim on a disability insurance policy. *Johnson*, 133 Ill. 2d at 521, 552 N.E.2d at 705. Johnson asked Moore, another attorney, to join him in representing the plaintiff. The plaintiff entered into a written contingent fee retainer agreement whereby he jointly retained Johnson and Moore's law firm, Kelly & Moore, on a one-third contingency basis. Johnson and the law firm orally agreed to a one-half division of the attorney fee. The case subsequently settled, with Johnson receiving a settlement check in the names of Johnson, the plaintiff and Kelly & Moore. Johnson later negotiated the check in his own name and in the name of Kelly & Moore. *Johnson*, 133 Ill. 2d at 524, 552

N.E.2d at 707. On review, the court addressed the issue of whether Johnson's relationship with Kelly & Moore vested him with implicit authority to negotiate the settlement check in their name despite lacking express authority to so act. *Johnson*, 133 Ill. 2d at 524-28, 552 N.E.2d at 707-08. The court stated:

> "Although the precise issue has not been previously addressed by this court, it appears well accepted in other jurisdictions that where lawyers between whom no general partnership relation exists jointly undertake to represent a client in a case, they may be regarded as joint venturers \*\*\* for the particular transaction. [Citations.] 'Thus, where an attorney retained on a contingent fee to prosecute a claim engages another lawyer to assist in the litigation, upon an agreement to share the fee in case of success, otherwise to receive nothing, they become joint venturers.' [Citations.] We accept this characterization of the relationship between two attorneys, like [Johnson] and the firm of Kelly & Moore in the present case, jointly representing a client on a contingent fee basis. This court has defined a joint venture as an association of two or more persons to carry out a single enterprise for profit. [Citations.] This definition aptly characterizes the relationship between the respondent and the firm of Kelly & Moore with regard to the representation of [the plaintiff]." *In re Johnson*, 133 Ill. 2d at 525-26, 552 N.E.2d at 707.

After concluding that the relationship between Johnson and the law firm of Kelly & Moore was that of joint venturers, the court applied partnership principles and held that the parties' relationship vested Johnson with implicit authority to endorse the settlement check in the name of Kelly & Moore. *Johnson*, 133 Ill. 2d at 526-27, 552 N.E.2d at 707-08.

Although in a different context, *Johnson* unequivocally holds that where two attorneys jointly represent a client on a contingent-fee basis, the relationship between the two attorneys is that of joint venturers. *Johnson*, 133 Ill. 2d at 525-26, 552 N.E.2d at 707-08. Here, as in *Johnson*, we are faced with "a single enterprise with a specific and singular purpose—the representation of a client." *Johnson*, 133 Ill. 2d at 527, 552 N.E.2d at 708. Arguably, in such a situation, there is no need to prove any of the elements cited by the trial court to prove a joint venture because the supreme court implicitly determined that such a relationship meets the requirement of a joint venture.

However, even though we have determined that Reske and the Firm were acting in all likelihood as joint venturers, that finding is not dispositive on the issue of the Firm's entitlement to two-thirds of the attorney fees. Rather, we must next determine whether a client who discharges a co-venturer nevertheless remains liable to pay that

discharged attorney his contingent fee. The Firm contends that if we conclude that it entered into a joint venture with Reske, partnership principles apply and based on those principles, it is entitled to two-thirds share of the attorney fees. The Firm bases its argument almost exclusively on *Ellerby v. Spiezer*, 138 Ill. App. 3d 77, 485 N.E.2d 413 (1985). While we do not reject *Ellerby*, it is not applicable here because, as will be more fully discussed below, the policy considerations that govern the dissolution of a partnership do not have comparable application to a joint venture.

In *Ellerby*, a law partnership dissolved. *Ellerby*, 138 Ill. App. 3d at 79, 485 N.E.2d at 415. Ellerby, one of the partners, filed a complaint for an accounting. The dispute concerned the distribution of profits from contingent fee cases pending at the time of the dissolution. *Ellerby*, 138 Ill. App. 3d at 79, 485 N.E.2d at 415. Spiezer, one of Ellerby's partners, argued on appeal that with respect to certain partnership contingent fee cases, the clients had discharged the partnership and retained him individually after the dissolution, thereby entitling him to the entire fees from those cases. *Ellerby*, 138 Ill. App. 3d at 81, 485 N.E.2d at 416. To resolve the issue of whether Speizer was entitled to the entire fee, the court turned to the provisions of the Uniform Partnership Act. The court noted that under the Uniform Partnership Act, the partnership's dissolution did not terminate its contractual relations with its clients and, therefore, the pending contingent fee cases remained "affairs of the partnership" which required winding up. *Ellerby*, 138 Ill. App. 3d at 81, 485 N.E.2d at 416. The court reasoned that, as a result, the fees from those cases were assets of the partnership to be distributed under the provisions of the Uniform Partnership Act. *Ellerby*, 138 Ill. App. 3d at 81, 485 N.E.2d at 416.

The court was "unimpressed" with and rejected Spiezer's contention that the clients had discharged the partnership and hired him individually. *Ellerby*, 138 Ill. App. 3d at 81, 485 N.E.2d at 416. The court held that under the Uniform Partnership Act, because the contingent fee cases were "unfinished business" of the partnership at the time of dissolution, Spiezer, as a partner of the dissolved partnership, was not entitled to take any action with respect to the unfinished business leading to purely personal gain, such as having the client discharge the partnership and hire him individually. *Ellerby*, 138 Ill. App. 3d at 81-82, 485 N.E.2d at 416-17. The court cited policy concerns for rejecting Spiezer's contention that when the clients fired the dissolved partnership, the contingency contracts ceased to be assets of the dissolved partnership. The court stated:

"[T]he holding Spiezer suggests would encourage partners of a law partnership facing dissolution to make attempts to convince clients

with cases having the most lucrative potential to hire them individually and discharge the partnership. This sort of case-chasing by attorneys should not be encouraged. Moreover, it places the clients of the dissolved law partnership precisely where they should not be placed; in the middle of a dispute among the partners over money." *Ellerby*, 138 Ill. App. 3d at 82, 485 N.E.2d at 417.

The court further stated:

"It is true that a client has the right to discharge his attorney at will. [Citation.] This, however, does not require the result Spiezer seeks. The clients of the partnership were free to be represented by any member of the dissolved partnership or by other attorneys of their choice. This right of the client is distinct from and does not conflict with the rights and duties of the partners between themselves with respect to profits from unfinished partnership business since, once the fee is paid to an attorney, it is of no concern to the client how the fee is distributed among the attorney and his partners. [Citation.] This does not result in improper fee splitting, as suggested by Spiezer, since, as we already noted, the partnership continues until the winding up of the partnership affairs has been completed, and it is perfectly proper for law partners to split fees among themselves. [Citation.]" *Ellerby*, 138 Ill. App. 3d at 81, 485 N.E.2d at 416.

The Firm argues that based on *Ellerby*, the contingency fee on the Thompson wrongful death case remained an asset of the joint venture, notwithstanding the Firm's discharge by the Thompsons. We disagree.

Although joint ventures and partnerships are treated as similar under general partnership principles (see *Johnson*, 133 Ill. 2d at 526-27, 552 N.E.2d at 707-08), the policy considerations articulated in *Ellerby* with respect to allocation of attorney fees upon dissolution of a partnership need not be applied to the dissolution of a joint venture. The controlling rule that the discharge of an attorney releases a client from his contingency fee obligations was not followed in *Ellerby* because of countervailing concerns to protect the winding down process of a partnership by preventing rapacious competition among the members of a law partnership in attempting to expropriate its clients each for themselves. See *Ellerby*, 138 Ill. App. 3d at 82, 485 N.E.2d at 416-17. This concern and resultant policy-driven conclusion in *Ellerby* need not be extended to the dissolution of a joint venture. While a law partnership involves multiple clients and a multitude of other intertwining business relationships among the dissolving partners, a joint venture relates to a single specific enterprise or transaction. See *Harmon*, 395 Ill. at 612, 71 N.E.2d at 83 (stating that a joint venture "relates to a single specific enterprise or transaction" while a partnership "relates to a general business of a particular

kind"). In effect, as previously stated, the joint venture among lawyers generally arises by virtue of both having been retained by a single client to represent him or her rather than by a prearranged agreement among the lawyers themselves. See *Johnson*, 133 Ill. 2d at 521-26, 552 N.E.2d at 705-08. Consequently, the dissolution of such a joint venture would be relatively simple and limited to the business of that single client. Under such circumstances, there would be no compelling reason to intervene in the client's right to discharge one attorney while retaining the other. The rationale articulated in *Ellerby* that the sharing of the contingent fee as between the attorneys does not "conflict" with the client's rights to fire any single one of his or her attorneys is not entirely correct. If an attorney remains obligated upon his retention to share his fee with the discharged attorney, that may ultimately compel the client to commit additional percentages of his recovery to fully compensate his retained attorney now that the other attorney is by reason of his discharge no longer available to share the labor and time expenditure involved in providing adequate representation. Thus, the policy in *Ellerby* should not be extended unnecessarily to a joint venture simply to protect the winding down process of a joint venture involving a single client.

Further, we also note that the Firm would be precluded from receiving a percentage-based fee under its fee-sharing agreement with Reske under Rule 1.5(f) of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 1.5(f)).

Rule 1.5(f) provides, in pertinent part:

"(f) *** [A] lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm, unless the client consents to employment of the other lawyer by signing a writing which discloses:

(1) that a division of fees will be made;

(2) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division; and

(3) the responsibility to be assumed by the other lawyer for performance of the legal services in question." 134 Ill. 2d R. 1.5(f).

Our finding that the Firm and Reske engaged in a joint venture with respect to the Thompson wrongful death case hinged on our conclusion, as urged by the Firm, that Reske in representing the Thompsons was acting as a co-venturer rather than as an employee of the Firm. Consequently, both Reske and the Firm would be subject to the requirements of Rule 1.5(f) that when lawyers entered into a fee-sharing arrangement, they must disclose the terms of the fee-sharing

arrangement and obtain the clients' consent thereto in a written agreement. The contingent fee agreement in this case does not disclose the terms of the oral fee-sharing arrangement among the co-venturers and hence does not comply with the disclosure requirements of Rule 1.5(f), which must be strictly enforced. See, *e.g.*, *In re Spak*, 188 Ill. 2d 53, 66-67, 719 N.E.2d 747, 754-55 (1999) (holding that there is no exception to Rule 1.5(c) of the Rules of Professional Conduct, which requires that a contingent fee contract be in writing even where the client knew of the fee terms from the outset and the client herself confirmed the terms in writing). The Rules of Professional Conduct apply to all claims for fee sharing, regardless of whether the claim is asserted against the client or another attorney. *Hofreiter v. Leigh*, 124 Ill. App. 3d 1052, 1055, 465 N.E.2d 110, 112-13 (1984) (applying Rule 2—107 of the Rules of Professional Responsibility (87 Ill. 2d R. 2—107), the predecessor to Rule 1.5, to a dispute between cocounsel over fees where one attorney was fired by client prior to settlement). Thus, the Firm and Reske's failure to comply with Rule 1.5(f) precludes enforcement of any oral fee-sharing agreement.

For the foregoing reasons, the judgment of the trial court in favor of Reske is affirmed.

Affirmed.

McBRIDE and O'MALLEY, JJ., concur.